OPINION OF THE COURT
Howard E. Levitt, J.
This is an action brought by Harry Zuckerberg, the insured, on a major medical policy issued by the defendant, Blue Cross and Blue Shield of Greater New York. Subsequent to the trial of this action Mr. Zuckerberg passed away. Upon the stipulation of both parties, Mrs. Zuckerberg, in her capacity as preliminary executrix of her husband’s estate, was substituted as the plaintiff.
Plaintiff’s deceased, at the time of the onset of his cancer, was insured by defendant under a community rated group of which Gadi Industries was the administrator. Johanna Zuckerberg, the plaintiff herein and the wife of the deceased since March 5,1977, was also the administratrix of the Blue Cross group for Gadi Industries. Subsequent to her marriage to the deceased, she conducted business under her former name of Johanna Merson. Gadi Industries had first commenced basic group coverage with defendant, Blue Cross in the 1960’s. On August 22, 1978, *835 group coverage with defendant was enlarged to include major medical coverage. On September 12,1978, plaintiff’s deceased became a subscriber through that group.
In the early part of December of 1980, Mr. Zuckerberg became ill. He was subsequently diagnosed as having a type of cancer known as fourth stage lymphoma. On February 4,1981, Mr. Zuckerberg was admitted on an in-patient basis at Hospital La Gloria, S.A., Baja, California, Mexico, to start his initial cancer treatment in the form of a nutritional therapy known as the Gerson Therapy. His stay at Hospital La Gloria, S.A., lasted until March 18, 1981. Plaintiff seeks to recover for the expenses incurred by the decedent as a result of his hospitalization.
Defendant denied coverage on three grounds, to wit:
(1) That Hospital La Gloria, S.A., doesn’t meet the requirements of the definition of “hospital” contained in the policy;
(2) That no benefits should be paid pursuant to a provision in the policy that excludes benefits for any part of a hospital stay during which services are rendered that are deemed “unnecessary” in the judgment of the defendant for proper medical care or treatment; and
(3) That no benefits should be paid under a policy exclusion for benefits for hospitalization during which “experimental” or “obsolete” procedures’ are employed.
In order to recover, plaintiff has the burden of proving compliance with all the provisions of the policies. (Whitlatch v Fidelity & Cas. Co. of N. Y.. 149 NY 45.)
At trial there was a question as to whether a brochure describing the benefits in broad terms with limited reference to exclusion constituted the contract for insurance between Mr. Zuckerberg and the defendant. The question became moot when plaintiff admitted at trial to having received a contract from defendant, which contains the afore-mentioned specific exclusions.
The first issue to be resolved is whether or not Hospital La Gloria, S.A., is a “hospital” as defined in the insurance policy. The relevant provision reads: “This part of your contract covers services provided by licensed hospitals. A ‘hospital’ is an institution for both medical and surgical or *836 obstetrical care, which provides 24-hour nursing service by registered graduate nurses who are present and on duty, and is supervised by a staff of physicians”.
Plaintiff contends that she has met her burden of proof of compliance with the policy definition in a twofold manner: First, that although Hospital La Gloria, S.A., concededly does not offer a full range of surgical and obstetrical care on its premises, it is under contractual agreement with Hospital Del Prado (a sister facility, with which it shares a common ownership, as is normally found between a nursing home and a hospital) for those services, thus substantially complying with the definition; and second, that the use of the unmodified word “surgical” in the definition creates an ambiguity, in that it can include both major or minor operations.
Dr. Hesse, an owner, testified by way of deposition that Hospital La Gloria, S.A., does perform some minor operations such as the suturing of minor wounds and deliveries. It would therefore substantially comply with the policy definition. There is a line of cases starting with McKinney v American Security Life Ins. Co. (76 So 2d 630 [La]), that holds that an institution can contract with another for facilities or services it lacks, so as to substantially meet the requirements of an insurance policy, thus enabling insured patients to recover on the policy. In Reserve Life Ins. Co. v Marr (254 F2d 289 [CA 9th], cert den 358 US 839), the court observed that the object of definitions, such as the one at bar, is to meet what the insurer determines will be a high standard of care ostensibly assuring the insured better treatment and an earlier discharge thereby minimizing the expenses to the company. The court then concluded that “[i]f such be the object to be accomplished, what difference would it make to a recovery whether the named facilities were under one management so long as the care was expertly provided and readily at hand?” (Supra, p 291.)
The substantial compliance rule was considered in Halper v Aetna Life Ins. Co. of Hartford (42 Misc 2d 184, affd 44 Misc 2d 437). There, plaintiff insured was denied recovery on a group accident and health policy because the institution had no resident physician and lacked an operating *837 room, X-ray room and pharmaceutical facilities. It thus failed to meet the requirements of the definition of hospital in the policy. The court disallowed the use of substantial compliance because the policy was clear and definite in saying “[t]he term ‘hospital’ means only an institution which meets fully every one of the following tests.” (42 Mise 2d 184, 192, supra; emphasis supplied.) However, no mention was made therein of a contract between the institution and any other hospital for its deficiencies. This fact and the afore-mentioned specificity (“meets fully every one”) of the policy distinguish Halper from the case at bar.
In the absence of convincing argument to the contrary, this court follows the precedent of McKinney v American Security Life Ins. Co. (76 So 2d 630 [La], supra) by holding that an institution can, through contractual arrangements with a nearby hospital, comply sufficiently with otherwise missing elements in a policy definition of hospital. Halper v Aetna Life Ins. Co. (42 Misc 2d 184, supra) has been sufficiently distinguished. The proof on trial showed that Hospital La Gloria, S.A., is licensed as a medical clinic with hospitalization facilities, by the Mexican Department of Public Health. Lacking in facilities for major surgical and obstetrical care, if is under contract with Hospital Del Prado, an acute general hospital located six to eight miles away, for these missing services. This contract is by an oral agreement between Dr. Curtis Hesse (an owner and administrator) of Hospital La Gloria, S.A., and Mrs. Riedel, an owner of Hospital Del Prado and also an owner of the physical plant that La Gloria leases out as its place of business. Rather than duplicating services offered at Hospital Del Prado, such as surgery, radiology, and laboratory work, these services were made available at Del Prado Hospital to La Gloria, S.A., patients because of the specific relationship between the two facilities. Dr. Rosas at one time headed a full acute surgery facility at Hospital La Gloria, S.A., that has since been dismantled. The common ownership, along with the oral agreement between the two facilities, suggest sufficient affiliation between the two hospitals to justify application of the substantial compliance rule.
Since this court finds that plaintiff has substantially complied with the definition of “hospital” in the policy, the *838 plaintiff’s contention that the word “surgical” is ambiguous need not be considered (but see Travelers Ins. Co. v Page, 120 Ga App 72).
The second issue to be resolved is whether in the judgment of the defendant insurer the services rendered by Hospital La Gloria, S.A., may be excluded under the .policy as “unnecessary”, and any concomitant expenses excluded as well. The relevant provision in the policy states: “No benefits are available for services that in our judgment are not needed for proper medical care or treatment. All or any part of a hospital stay related to an unnecessary service is also excluded” (emphasis supplied).
This is language which is typically contained in an “adhesion contract.” The phrase “adhesion contract” is shorthand descriptive of standard form printed contracts prepared by one party and submitted to the other on a “take it or leave it” basis. The law has recognized that there is often no true equality of bargaining power in such contracts and has accommodated that reality in construing them (see Kessler, Contracts of Adhesion, 43 Col L Rev 629).
Indeed, the standard clauses in insurance policies are the most striking illustrations of successful attempts on the part of business enterprises to select and control risks assumed under a contract. The weaker party in need of the services is frequently not in a position to shop around for better terms either because the author of the standard contract has a monopoly or because all competitors use the same clauses. Thus, the insured’s contractual intention is but a subjection more or less voluntary to terms dictated by the insurer, terms whose consequences are often understood only in a vague way, if at all. For example, in Lopez v Blue Cross of La. (386 So 2d 697 [La]), the court was faced with an exclusion that left to the judgment of the insurer, the determination as to whether or not hospitalization was medically necessary. A claim for coverage was to be reviewed and paid if, in the insurer’s opinion, it was a covered occurrence. The court decided that provision was valid and not contrary to public policy, and interpreted the phrase as expressing the practice and policy of all insurers. The court’s rationale was that the insurer is not the sole *839 authority because the review and denial of claims under this exclusion was also subject to judicial review by the courts. An opposite result was reached in a recent City Court of Buffalo, New York, decision, Weissman v Blue Cross of Western N. Y. (116 Misc 2d 1063), which held that the provision in a policy, which left to the sole judgment of the insurer the determination as to whether private duty nursing was medically necessary, was unconscionable and unenforceable. That court relied upon the unequal bargaining positions of the parties with respect to standard form contracts. The fact that the courts have a right to review an insurer’s judgmental determination seems to be the better view. Accordingly, this court finds the subject provision does not offend public policy and will now turn to a review of defendant’s determination.
Attached to Dr. Curtis Hesse’s deposition are various exhibits including a section entitled “Harry Zuckerberg Miscellaneous Medical Records”. In this section there are two letters written by Dr. George Canellos, Mr. Zuckerberg’s treating physician, who is an Associate Professor of Medicine at Harvard Medical School and Chief of the Division of Medical Oncology at Sidney Farber Cancer Institute in Boston, Mass., and addressed to Dr. Arthur Savitsky of Long Island Jewish-Hillside Medical Center. In the letters, Dr. Canellos refers to two consultations with Mr. Zuckerberg in which he made diagnoses of his cancer. In the letter dated July 2,1981, Dr. Canellos writes that he had seen Mr. Zuckerberg since his treatment at Hospital La Gloria, S.A., that “he [Zuckerberg] appears to be quite well,” and he opined that “aggressive therapy at this time would not significantly increase his survival.” Dr. Canellos went on to say, “he [Zuckerberg] does not seem to have suffered as a result of his metabolic diet, except in convenience and expense,” and, “I advised him that it was acquiring a new religion [the Gerson Therapy] and that the tragedy would lie only in those patients who could not afford this kind of treatment and would have to sacrifice their finances to acquire it.” (Emphasis supplied.) The point is that Mr. Zuckerberg was not adversely affected by the treatment and actually showed signs of stabilization. At trial it was disclosed that neither defendant’s expert witness, Dr. Rivlin, nor any other person or doctor associated *840 with defendant examined Mr. Zuckerberg to see the results of the treatment. How then could a judgmental determination be made? Certainly not by prolonging treatment, but rather by providing the best available effective treatment. Effectiveness is measured by its results. How could defendant exclude this treatment as ineffective without ever looking at the results? The answer can only be — it could not.
Based upon the foregoing, this court holds that plaintiff has sustained its burden in showing that Mr. Zuckerberg’s treatment could not be classified as unnecessary.
The final issue to be decided is whether or not coverage may be denied under an exclusion for benefits for hospitalizations during which “experimental” or “obsolete” procedures are employed. The pertinent provision in the policy reads: “We will not cover any procedure if it is no longer generally regarded as effective or if it is experimental in the sense that its effectiveness is not generally recognized. A procedure will be covered if an appropriate governmental agency Federal or New York State, recognizes it as sufficiently effective to justify any risks that may be involved. Benefits will also not be available for a hospital stay for such an experimental or obsolete procedure.”
The basis upon which this exclusion for experimental or obsolete procedures rests is: Are the procedures generally recognized as effective? However, this provision neither contains a standard to judge whether a procedure has been so generally recognized, nor criteria to qualify an appropriate governmental agency. It is merely a guideline. Any ambiguity must be resolved in favor of the insured (Sincaff v Liberty Mut. Fire Ins. Co., 11 NY2d 386). It must be pointed out that the Gerson Therapy was developed more than 30 years ago and defendant’s expert concedes it is a very well known treatment. Nevertheless, Dr. Rivlin contends that it is not a question as to whether the therapy is experimental but (using the very term the court has determined should be the criterion for the policy language “necessary”) rather whether it is “effective” in the treatment of cancer. To date, defendant’s expert states, there are no articles “in the peer' reviewed scientific literature which has looked at objective cases and shown it to be *841 effective.” This is defendant’s sole support for its determination, in its own judgment, to exclude benefits notwithstanding the longevity of this regimen. However, Freeman W. Cope, M.D., of the Biochemistry Laboratory, Naval Air Development Center, Warminster, Pennsylvania, stated in a recent work supported in part by the Office of Naval Research that, “The Gerson cancer therapy is an integrated set of medical treatments which has cured many cases of advanced cancer in man * * * This empirically derived cancer therapy contained a number of unconventional features, which were justified by the fact that they did indeed cure advanced cancer.”
Defendant, in its brief, claims that the language in the exclusion can only mean “generally recognized by the medical-scientific community as effective.” This is not evident. Defendant has brought to the attention of the court a recent case entitled, Henne v Mutual of Omaha (US Dist Ct, DC, Civ 81-1359, Jan. 10, 1983) which turned on a provision excluding “services and supplies not prescribed by a doctor in accordance with generally accepted professional medical standards(Emphasis supplied.) In the case at bar, the clause in question makes no mention of “professional medical standards,” it only states “generally recognized as effective.” If defendant wanted the exclusion to mean generally recognized by the medical-scientific community, it should have said so in the policy.
Absent applicable contractual exclusions, therefore, there is full coverage for the hospital stay and services rendered. Plaintiff has met the burden of proving the existence of coverage and the absence of any disqualifying exclusions.
Faced with the devastating awareness of a dread disease, Mr. Zuckerberg and his wife chose a course of treatment which, while not in the medical mainstream, was in use over many years. Had chemotherapy or other mainstream treatments been followed, there was no guarantee of his survival or the prolongation of his life span. The choice they made does, as has been noted, comply with the provisions of the health insurance policy. Mr. Zuckerberg lived for one year and nine months following his initial treat *842 ment. A possible path was opened, had it not been taken, what then? At least, it was tried.
“For of all sad words of tongue or pen, The saddest are these: It might have been!” (Maud Muller, John Greenleaf Whittier, stanza 53.)