JOHANNA ZUCKERBERG, as Administratrix of the Estate of HARRY J. ZUCKERBERG, Deceased, Respondent, v BLUE CROSS AND BLUE SHIELD OF GREATER NEW YORK, Appellant.

Second Department, April 8, 1985

**APPEARANCES OF COUNSEL**

*Ellen Barrett Levin* (*John L. Shurtleff, Jerrold I. Ehrlich* and *John Colucci* of counsel), for appellant.

*Bertram Herman* for respondent.

**OPINION OF THE COURT**

Per Curiam.

Presented on this appeal is the novel question of whether a health facility, which specializes almost exclusively in an

unorthodox and scientifically unproven treatment of cancer, can be considered a "hospital" with services subject to reimbursement pursuant to a health insurance policy issued by defendant Blue Cross and Blue Shield of Greater New York (hereinafter Blue Cross). Contrary to the conclusion reached by Special Term, we conclude that defendant properly declined to provide benefits for the treatment rendered to plaintiff's decedent at the subject facility inasmuch as (1) that institution failed to satisfy the definition of a "hospital" as set forth in article II (§ D, subd 1) of the parties' health insurance contract and (2) the method of therapy administered there came within the policy exclusion for experimental procedures contained in article V (subd M, para 5). Under these circumstances, the judgment in favor of plaintiff should be reversed and the complaint dismissed.

Harry J. Zuckerberg, plaintiff's deceased husband,[*] was insured by Blue Cross under a community rated contract for hospital, surgical-medical and major medical benefits issued to Gadi Industries, a closed corporation owned solely by decedent and plaintiff. Plaintiff served as administrator for the health insurance issued to Gadi Industries. Plaintiff's and decedent's coverage under Blue Cross' Million Dollar Master Medical Program became effective on September 12, 1978.

In December 1980, Mr. Zuckerberg was diagnosed as having "moderately well-differentiated lymphocytic lymphoma — stage III and possible stage IV". The diagnosing physician wrote to a medical colleague that he had "every confidence that this will be a responsive lymphoma to chemotherapy" and felt "reasonably confident that within six months to a year some systematic therapy will be needed, and depending on the pattern of reoccurrence, the intensity of chemotherapy will be gauged".

The record does not show that Mr. Zuckerberg pursued conventional treatment for cancer, including chemotherapy. Instead, he sought treatment at a facility called Hospital La Gloria, S.A., located in Tijuana, Mexico, just south of the California border. The method of treatment utilized at this facility is nutritionally based and is called "Gerson therapy" after its founder. Gerson therapy involves a dietary regimen consisting of large numbers of organically grown fruits and vegetables and their juices, together with certain medications, digestive aids and vitamins. Laetrile, not a regular part of the Gerson therapy, was administered at a patient's request.

---

[*] Mr. Zuckerberg passed away subsequent to the trial of this action. By stipulation of the parties, Mrs. Zuckerberg, in her capacity as preliminary executrix of her husband's estate, was substituted as plaintiff.

Mr. Zuckerberg was treated at Hospital La Gloria on three occasions, from February 4, 1981 through March 18, 1981, from September 13 until September 18, 1981 and from January 11 until January 14, 1982. Blue Cross declined to reimburse Mr. Zuckerberg for the costs of his treatment at La Gloria whereupon he commenced the instant action to recover his expenditures pursuant to the provisions of the health insurance policy issued by Blue Cross.

The contract defines a hospital as "an institution supervised by a staff of physicians which provides both medical and surgical or obstetrical care and 24-hour nursing service by registered graduate nurses who were present and on duty" and does not include "nursing or convalescent homes and institutions; institutions primarily for rest or for the aged; spas; sanitariums; infirmaries at schools, colleges or camps; and unless specifically designated by us, any institution primarily for treating drug addiction, alcoholism or mental disorders". The aforesaid definition of a hospital is an operable provision of the health insurance policy which is a prerequisite for obtaining coverage and plaintiff thus has the burden to establish, by a preponderance of the evidence, that Hospital La Gloria comes within this definition (*see, Whitlatch v Fidelity & Cas. Co.,* 149 NY 45, 49).

■ The record reveals that plaintiff has failed to sustain her burden of proof that Hospital La Gloria constitutes a hospital in accordance with the contractual definition. The evidence established that Hospital La Gloria did not provide "both medical and surgical or obstetrical care". Dr. Marvin B. Blitz, Associate Medical Director of Blue Cross, inspected Hospital La Gloria and found it to be located in a converted motel. He observed that La Gloria possessed none of the following facilities generally associated with an "acute general hospital", a term characterizing all of the hospitals which are Blue Cross members: operating rooms, an emergency room, an intensive care unit, diagnostic laboratories, a radiology department and facilities for obstetrical or gynecological procedures.

Dr. Curtis C. Hesse, the administrator of Hospital La Gloria, acknowledged in his deposition that although that facility is licensed by Mexican health authorities to perform surgery, no major surgery has been performed there since 1978, when the facilities which existed for such surgery were dismantled. There is one room with a table that can be employed for emergency procedures such as the minor suturing of wounds. Dr. Hesse stated that there have been deliveries of babies performed there, but he did not indicate that this was a regular practice. According to Dr. Hesse, Hospital La Gloria does not have an emergency

room and utilizes outside laboratories to perform most diagnostic tests. Dr. Hesse and Dr. Blitz both stated that Gerson therapy was the primary treatment administered at La Gloria.

The terms "medical and surgical or obstetrical care" are not ambiguous and, thus, must be construed in accordance with their plain and ordinary meanings in the context of a modern hospital (see, Halper v Aetna Life Ins. Co., 42 Misc 2d 184, 191-192, affd 44 Misc 2d 437, affd 24 AD2d 703, lv dismissed 17 NY2d 484). In this context, a reasonable person in the position of the insured (see, Halper v Aetna Life Ins. Co., supra, pp 191-192) would almost definitely conclude that an institution, such as La Gloria, which merely had facilities for bandaging minor wounds and lacked an operating room and facilities for anesthesia, was not equipped to perform surgery as it is understood in the modern sense.

In addition, the policy definition of covered "surgical service" supports the conclusion that the minor procedures which La Gloria was equipped to perform do not constitute the "surgical care" encompassed in the definition of a "hospital". "Surgical service includes closed reduction of fractures, dislocation of bones, endoscopies requiring use of the surgical facilities of the hospital and any incision or puncture of the skin or other tissue except for innoculation, vaccination, collection of blood, drug administration or injection". Nor is there any evidence that obstetrical procedures, including the delivery of babies, are performed at La Gloria with any degree of regularity. Therefore, the facilities available at Hospital La Gloria, itself, do not satisfy the plain meaning of the contractual requirement that a hospital must provide "both medical and surgical or obstetrical care".

Special Term erroneously concluded that Hospital La Gloria was in substantial compliance with the contractual definition of a hospital by virtue of its informal oral understanding with Hospital Del Prado to the effect that its patients may use the latter facilities for major surgery, radiology and laboratory work. It bears noting that Dr. Blitz characterized Hospital Del Prado as an acute general hospital on the community level. With respect to this issue, Special Term assessed the evidence as follows (119 Misc 2d 834, 837): "The proof on trial showed that Hospital La Gloria, S.A. is licensed as a medical clinic with hospitalization facilities, by the Mexican Department of Public Health. Lacking in facilities for major surgical and obstetrical care, it is under contract with Hospital Del Prado, an acute general hospital located six to eight miles away, for these missing services. The contract is by an oral agreement between

Dr. Curtis Hesse * * * and Mrs. Reidel, an owner of Hospital Del Prado and also an owner of the physical plant that La Gloria leases out as its place of business. Rather than duplicating services offered at Hospital Del Prado, such as surgery, radiology and laboratory work, these services were made available at Del Prado Hospital to La Gloria, S.A., patients because of the specific relationship between the two facilities. Dr. Rosas at one time headed a full acute surgery facility at Hospital La Gloria, S.A., that has since been dismantled. The common ownership, along with the oral agreement between the two facilities suggest sufficient affiliation between the two hospitals to justify application of the substantial compliance rule."

In so concluding, Special Term relied primarily upon a line of decisions from other jurisdictions including *McKinney v American Sec. Life Ins. Co.* (76 So 2d 630 [La]) and *Reserve Life Ins. Co. v Marr* (254 F2d 289, *cert denied* 358 US 839). The only decision where a New York court was faced with an issue similar to that at bar was *Halper v Aetna Life Ins. Co.* (42 Misc 2d 184, *supra*). The court therein declined to adopt the substantial compliance doctrine as have a significant number of appellate courts in other jurisdictions as well as Federal courts (*see, e.g., Taylor v Phoenix Mut. Life Ins. Co.*, 453 F Supp 372; *Kravitz v Equitable Life Assur. Socy.*, 453 F Supp 381; *Burk v Prudential Ins. Co.*, 7 NC App 209, 172 SE2d 67; *Guardian Life Ins. Co. v Scott*, 405 SW2d 64 [Tex]; *Aetna Life Ins. Co. v Deckard*, 488 SW2d 487 [Tex]). Although the substantial compliance doctrine may be appropriate under circumstances different from those at bar, it would not serve the policy of promoting effective and economical health care to apply that doctrine to Hospital La Gloria. Those institutions which have been held to be in substantial compliance with various definitions of a "hospital" contained in health insurance policies, by virtue of arrangements to share facilities and equipment with nearby hospitals, differ from Hospital La Gloria in material respects. In contrast to Hospital La Gloria, which possessed none of the facilities and equipment associated with an acute general hospital, the clinic at issue in *McKinney v American Sec. Life Ins. Co.* (*supra*) had most of those facilities, including an operating room, with the exception of X-ray equipment. The institutions involved in many of the out-of-State decisions which have adopted the substantial compliance doctrine had formal, written contracts for shared facilities and equipment, unlike the oral understanding between La Gloria and Del Prado at bar (*see, Reserve Life Ins. Co. v Marr, supra; Mobile Psychiatric Serv. v Employers Life Ins. Co.*, 362 So 2d 244

[Ala]; *Reserve Life Ins. Co. v Mattocks,* 6 Ariz App 450, 433 P2d 303).

By the admissions of Dr. Hesse, Hospitals La Gloria and Del Prado were located between six and eight miles apart. These hospitals were further apart than the affiliated institutions involved in many of the decisions from other jurisdictions (*see, Reserve Life Ins. Co. v Marr, supra; Mobile Psychiatric Serv. v Employers Life Ins. Co., supra; Raynor v American Heritage Life Ins. Co.,* 123 Ga App 247, 180 SE2d 248).

The definition of a hospital contained in article II (§ D, subd 1) of Blue Cross' contract must be construed in the context of other contractual provisions, including the description in article II (subd E, para 1) of the range of covered inpatient services which are characteristically provided in an acute general hospital. Moreover, the regulations of the State Department of Insurance, which prescribe the minimum standards for the form and content of health insurance policies, define a "hospital" as a "short-term, acute, general hospital, which * * * has organized departments of medicine and major surgery" (11 NYCRR 52.2 [m] [2]). This does not mean that an institution specializing in the treatment of a particular medical condition, including cancer, could not qualify as a "hospital", pursuant to the definition in defendant's contract, provided that it possessed the facilities necessary to provide "medical and surgical or obstetrical care".

■ There is an independent ground for concluding that Blue Cross properly denied coverage for the treatment plaintiff's decedent received at Hospital La Gloria. The defendant insurer sustained its burden of establishing that the Gerson therapy Mr. Zuckerberg received at La Gloria came within the exclusion set forth in article V (§ M, subd 5) of the contract for a procedure that "is experimental in the sense that its effectiveness is not generally recognized" (*see, Neuwirth v Blue Cross & Blue Shield,* 62 NY2d 718, 719). Defendant's expert witness, Dr. Richard S. Rivlin, Chief of the Nutrition Service at Memorial Sloan-Kettering Cancer Center, testified that he is familiar with the area of nutrition and cancer and has conducted a review of the relevant scientific literature. He has been unable to find any documentation establishing that Gerson nutritional therapy is an effective treatment for cancer using an objective scientific method. The only literature which Dr. Rivlin was able to find which advocated Gerson therapy consisted of books written by Dr. Max Gerson or materials issued by the Gerson Institute or related bodies. Article V (§ M, subd 5) of defendant's

contract further explains the meaning of a treatment or procedure whose effectiveness is generally recognized, as follows: "A procedure will be covered if an *appropriate* governmental agency Federal or New York State, recognizes it as sufficiently effective to justify any risks that may be involved" (119 Misc 2d, at p 840). Dr. Rivlin introduced into evidence numerous articles and statements by such well-respected organizations as the American Cancer Society and the New York Academy of Medicine which concluded that Gerson therapy had no proven value in the treatment of cancer. Plaintiff has not presented any significant evidence to controvert the conclusion of Dr. Rivlin and the medical literature upon which he based his opinion and to establish that an appropriate Federal or State governmental agency has stated that Gerson therapy is an effective treatment for cancer.

In conclusion, the denial of coverage by defendant Blue Cross for the Gerson therapy Mr. Zuckerberg received at La Gloria will not discourage the development and acceptance of legitimate innovative methods of treating cancer. It will, rather, have the desirable effect of affording greater protection to the general public and, in particular, cancer patients who are especially vulnerable to unfounded claims of miraculous cures. Specifically, our decision will insure that the treatment rendered on behalf of patients is administered in facilities comporting with certain minimal standards and that its effectiveness has been adequately demonstrated by studies conducted in accordance with appropriate scientific methodology before the resources of a major health insurer are utilized to support it.

O'CONNOR, J. P., WEINSTEIN, LAWRENCE and EIBER, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered August 15, 1983, reversed, on the law and the facts, without costs or disbursements, and complaint dismissed.