### Janet SCHNITKER, Plaintiff,

### v.

### BLUE CROSS/BLUE SHIELD OF NEBRASKA, Defendant.

### No. 8:CV91–00412.

United States District Court, D. Nebraska.

Nov. 11, 1991.

Tyler J. Sutton, Woods, Aitken Law Firm, Lincoln, Neb., for plaintiff.

Steven D. Davidson, Thomas E. Johnson, Baird, Holm Law Firm, Omaha, Neb., for defendant.

### MEMORANDUM OPINION

STROM, Chief Judge.

### INTRODUCTION

This matter is before the Court for decision following an expedited two and one-half day trial on October 10–12, 1991, of a claim to recover benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461.

Having carefully considered the pleadings, testimony of witnesses, documents and other evidence of record, and party briefs, the Court hereby makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1) The defendant Blue Cross/Blue Shield ("Blue Cross") is a health insurance company licensed and doing business in the state

of Nebraska. Plaintiff Janet Schnitker is insured by Blue Cross through a group health insurance policy issued to her husband's employer, Superior Deshler Company ("Superior"). Plaintiff's eligibility to participate in the group policy arises from her husband's employment with a related company of Superior, Ace Sales, Inc. ("Ace Sales").

2) Superior has contracted with Blue Cross to provide and supervise the administration of health-care coverage for its employees. The plan is known as a Master Group Contract Employer/Association Custom Flex Major Medical. Ace Sales pays the entire premium for employees electing single coverage and approximately seventy-five per cent (75%) for those, such as plaintiff's husband, electing family coverage. Ace Sales deducts premium amounts owed by an employee, if any, from the employee's paycheck and then forwards the full premium amount to Superior, which, in turn, remits a lump-sum payment to Blue Cross. Ace Sales also contributes part of each employee's deductible amount. Employees are eligible to participate in the plan if they work at least twenty-five (25) hours per week. Superior has provided health benefits to its employees for the entire forty-one (41) years Mr. Schnitker has been employed by it, and there is no evidence suggesting it will not continue to do so for the indefinite future. Mr. Schnitker testified he expected this benefit to continue into the future. In light of Superior's consistent and long-term commitment to providing health benefits to its employees, its purchase of group insurance from Blue Cross clearly constitutes an employee welfare benefits plan.

3) Blue Cross is the plan administrator and fiduciary. Since Blue Cross pays benefits from its own funds, it has a conflict of interest when determining the eligibility of participants for benefits.

4) The plan provides group health insurance to beneficiaries subject to certain exclusions, conditions, and limitations.

5) One of these exclusions is for "investigative treatments."

6) The terms of the Master Contract, not the explanation of benefits provided to plaintiffs, embodies the controlling definition of "investigative treatment." The explanation of benefits clearly alerted readers that it was merely a convenient overview and that the Master Contract was the authoritative statement of the insurance policy. If they had so desired, the Schnitkers could have read the Master Contract.

7) The Master Contract defines "investigative treatment" as follows:

Treatment is considered investigative when the service, procedure, drug, or treatment modality has progressed to limited human application, but has not achieved recognition as being proven and effective in clinical medicine.
Such recognition may be achieved through the following:
  1. Final approval for use of a specific service, procedure, drug or treatment modality for a specific diagnosis from the appropriate governmental regulatory body;
  2. Scientific evidence permitting a consensus conclusion recognizing the effectiveness of the specific service, procedure, drug or treatment modality on health outcomes for a specific diagnosis.
We shall determine whether a service, procedure, drug or treatment modality is Investigative.

8) Mrs. Schnitker, who is fifty-four (54) years old, was diagnosed in January, 1991, as suffering from multiple myeloma, a relatively uncommon form of cancer affecting the plasma cells in bone marrow for which no cure is known. Upon diagnosis, plaintiff was referred to Dr. Jorge Spinolo, an oncologist practicing in the bone marrow transplant unit at the University of Nebraska Medical Center.

9) Dr. Spinolo proposes to treat plaintiff utilizing high-dose chemotherapy with autologous stem-cell rescue ("HDC–AR"), pursuant to a research protocol designed for patients, such as plaintiff, who have not been previously treated for their multiple myeloma. The regimen utilizes three successive combinations of drugs at conven-

tional levels to reduce tumor burden, identified by the shorthand designations "VAD," "CVAD," and "DEP." Then, following collection of stem cells from the patient's peripheral blood, the patient receives high doses of melphalan, followed by combined high doses of VP–16 and cytoxan, together with total body irradiation. The VP–16 and cytoxan are given at dose levels which are myeloablative, that is, high enough to kill the patient's bone marrow. Last, the patient's own stem cells are reinfused into the patient ("autologous") in order to, if all goes well, "rescue" the patient from that bone marrow damage which otherwise would be fatal.

10) Mrs. Schnitker elected to receive Dr. Spinolo's proposed treatment and is now in the preliminary stages of the treatment receiving conventional doses of chemotherapy. Currently, her multiple myeloma is in remission. She is to undergo HDC–AR at the University of Nebraska Medical Center ("UNMC") as soon as arrangements can be made for payment of the estimated $130,000—150,000 cost of the procedure. UNMC requires payment or a guarantee of payment, from a health insurer or other source, before allowing the treatment to proceed.

11) A description of the proposed treatment was submitted to Blue Cross for precertification of benefits. The claim was considered and denied pursuant to the investigative treatment exclusion of the policy. Specifically, Blue Cross objected on the grounds that the treatment has not progressed beyond limited human application and has not achieved recognition as being proven and effective in clinical medicine.

12) Prior to issuing its denial of plaintiff's claim, Blue Cross examined plaintiff's medical history, the specific treatment regimen proposed, and the current state of medical literature discussing the application of high-dose chemotherapy with autologous rescue to multiple myeloma.

13) HDC–AR as a treatment for multiple myeloma is in an early stage of development. Although the annual incidence of the disease in the United States is roughly eight thousand (8,000) cases, only approximately two hundred to four hundred (200–400) multiple myeloma patients have undergone HDC–AR to date worldwide.[1] All these patients received the treatment in the context of phase I and phase II clinical trials, in which researchers study drug toxicity, whether the treatment has any effect on the cancer, and, if so, which drug combinations at which dosages and at which schedules may produce such effects. The substantial majority of these patients were refractory, that is, had become resistant to conventional therapy. Seventy (70) of the patients were untreated, non-refractory patients like plaintiff. While eight to ten research centers around the country currently are studying HDC–AR on multiple myeloma, most use different drugs and/or drug combinations on patients with varying disease characteristics and treatment histories. No multiple myeloma patient in the reported literature, with or without disease characteristics similar to plaintiff, has received the same series of chemotherapeutic drugs as is proposed for the plaintiff by Dr. Spinolo.[2] Plaintiff would be the fourth patient enrolled in Dr. Spinolo's protocol, which calls for a maximum of forty (40) test subjects.

14) As required by federal law, Dr. Spinolo requested that plaintiff sign, and plaintiff did sign, an informed consent form describing the procedure. The form is labeled "Consent—Human Investigation," repeatedly utilizes the term "research study," and otherwise describes the investigative nature of the procedure.

15) The protocol document drafted by Dr. Spinolo and submitted for institutional approval states that all patients "must be informed of the investigational nature of this study." It also utilizes the terms "research," "investigate," and phrases its ob-

---

**1.** This figure may be relatively low in part because the disease primarily strikes older persons who generally are not considered promising candidates for the treatment.

**2.** Dr. Spinolo is the only known researcher of HDC–AR on multiple myeloma using myeloablative doses of VP–16 and cytoxan.

jectives in terms of determining whether the procedure proposed is or is not of benefit to the patient.

16) The protocol was submitted to and approved by UNMC's Institutional Review Board, a body mandated by federal law to review and approve the initiation of biomedical research involving human subjects. Such submission and approval was required by the Board's own rules and by federal regulation.

17) The drug dosages and schedules utilized in the protocol are "new drugs" as defined by the Food and Drug Administration, and are subject to applicable regulations. The dosages described in the protocol exceed by several times the labeled dosages approved by the FDA.

18) The medical literature does not reflect adequate information from which the medical community may reach a consensus conclusion about the effectiveness of HDC–AR on multiple myeloma. All reported investigations involve phase I and phase II clinical trials, a limited number of patients, a large variety of treatment proposals, and leave unresolved a large number of open questions about numerous aspects of the procedure. Although a few investigations suggest a causal link between HDC–AR and partial or complete remission of the disease, the likelihood of patient-selection bias seriously undermines their reliability. Even if such a link exists, medical evidence is inconclusive on whether remission results in prolonged survival or better quality of life.

## CONCLUSIONS OF LAW

1) The group insurance policy at issue in this case is an "employee welfare benefit plan" as defined in 29 U.S.C. § 1002(1). As such, this case is controlled in its entirety by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461. This Court has jurisdiction pursuant to 29 U.S.C. § 1132(e)(1).

2) By virtue of the clause, "We shall determine whether a service, procedure, drug or treatment modality is investigative," the plan gives Blue Cross discretionary authority to construe the definition of "investigative" and to determine eligibility pursuant to that term.

3) Defendant's decision to deny benefits in this case should be upheld unless arbitrary and capricious. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989).

■ 4) Notwithstanding defendant's conflict of interest, its decision to deny benefits in this case was based on a reasonable interpretation of plan provisions, was made in good faith, and was made following a detailed factual background investigation of the claim and the proposed treatment.

5) Defendant's determination that high-dose chemotherapy with autologous stem cell rescue as a treatment for multiple myeloma is investigative, as defined in the policy, is reasonable, and was made after rational consideration of relevant facts.

6) Thus, defendant's decision to deny plaintiff's claim was not arbitrary and capricious.

■ 7) Even if the Court were to apply a de novo standard of review, the Court would determine that the decision to deny the claim was correct. The current state of medical research and knowledge about the use of HDC–AR as a treatment for multiple myeloma indicates that the treatment is "investigative" (as ordinarily understood) and has not achieved recognition in clinical medicine as being "proven" and "effective" (as those terms are ordinarily understood).

8) Plaintiff's claims for benefits should be denied, and judgment should be entered in favor of the defendant, Blue Cross/Blue Shield of Nebraska.

## CONCLUSION

While the Court understands plaintiff's desire to undergo the treatment in question in hopes of prolonging her life, the Court may not order the defendant to provide coverage which it is not legally obligated to do under the terms of the policy it issued. The Court also must be mindful that an application for benefits implicates the rights of other members of the plan. To-

day, high-dose chemotherapy with autologous stem cell rescue as a treatment for multiple myeloma, especially using myeloablative doses of the drugs called for by the protocol proposed for plaintiff, remains an unproven treatment whose efficacy is uncertain. The insurance policy in question clearly excludes coverage for such treatment.

A separate order will be entered in accordance with this memorandum opinion.