Michelene D. KEKIS, Plaintiff,

v.

BLUE CROSS AND BLUE SHIELD
OF UTICA–WATERTOWN, INC.,
Defendant.

No. 93–CV–128.

United States District Court,
N.D. New York.

March 12, 1993.

Robert B. Koegel, Rochester, NY, for plaintiff.

Costello, Cooney & Fearon, Syracuse, NY (Paul G. Ferrara, of counsel), for defendant.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

This litigation presents a question of contract interpretation. Given the wide publicity and public interest that the case has generated, litigants in the future might attempt to attribute to this decision more value than is warranted. As will be discussed more thoroughly below, such reliance would be

misguided. The court's ruling today—that the defendant must provide insurance coverage for plaintiff's cancer treatment—is based solely upon the court's interpretation of this particular plaintiff's health insurance policy. Future litigants seeking similar relief will find clearer guidance on how best to proceed in their own insurance policies rather than in this decision.

Plaintiff commenced this suit on January 27, 1993, pursuant to section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 (1988 & West Supp.1992). Plaintiff alleges that her health insurance provider, defendant Blue Cross and Blue Shield of Utica–Watertown, Inc. ("BC/BS"), has wrongfully denied her coverage to which she is entitled under her health insurance policy. Plaintiff seeks, *inter alia*, an injunction ordering defendant to provide her coverage for certain medical treatment. Defendant denies that plaintiff is entitled to the coverage she seeks. This court has jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 (1988).

Along with her complaint, plaintiff filed an application for a preliminary injunction ordering defendant to provide the relevant coverage immediately. This court conducted an evidentiary hearing on plaintiff's application and directed the parties to submit written arguments and affidavits supporting their respective positions. Having considered all of the relevant testimony, exhibits, and written submissions in light of the applicable laws, the court now issues the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 65.[1]

## I. FINDINGS OF FACT

### A. Need for coverage

On May 26, 1992, plaintiff Michelene Kekis, a resident of Rome, New York, went to her local doctor's office for a routine mammogram. The mammogram revealed a suspicious mass in her right breast. A subsequent sonogram indicated that the mass was solid. Noting the strong possibility of a malignancy,[2] a surgeon at Rome Hospital excised the mass and submitted it to the laboratory for a biopsy. The biopsy revealed that Ms. Kekis had an infiltrating ductal carcinoma, more commonly known as breast cancer. *See* Kekis Aff. (1/25/93) ¶ 3.

After learning of the diagnosis, Ms. Kekis met with various oncologists, each of whom told her that the excision likely provided only temporary relief and that the cancer would almost certainly reappear absent immediate further treatment. In fact, one of her doctors, Dr. Ellis Levine of the Roswell Cancer Institute, told her that she was at an especially high risk for recurrence because seventeen of her eighteen lymph nodes tested positive for cancer. *See* Levine Aff. (1/25/93) ¶ 5. Dr. Levine further explained that the threat of a recurrence is so dangerous because a reappearing cancer is almost always metastatic. Metastatic cancer, or cancer which has spread to other parts of the body, is widely believed by the medical community to be incurable and fatal. *Id.* ¶ 6; *accord,*

---

1. In reviewing plaintiff's application, the court is required to "set forth the findings of fact and conclusions of law which constitute the grounds of its action." Fed.R.Civ.P. 52(a); *see Fengler v. Numismatic Americana, Inc.,* 832 F.2d 745, 748 (2d Cir.1987) (citation omitted); *see Weitzman v. Stein,* 897 F.2d 653, 658 (2d Cir.1990). The court's factual findings are based not only upon testimony adduced at the hearing but also upon exhibits submitted by each party. To the extent that certain facts are undisputed, the court will additionally utilize case authority to substantiate and explain its findings.

 The parties have declined to convert this proceeding into a hearing on the merits pursuant to Fed.R.Civ.P. 65.

2. Breast cancer was a "strong possibility" because Ms. Kekis fell into a high risk category for acquiring the disease. She was approximately 50 years old at the time of the diagnosis, and her mother and grandmother both died of cancer. *See* Def. exh. "C". According to the American Cancer Society:

 Breast cancer is still the most common form of cancer among American women. One in nine women will develop breast cancer, about 175,-000 this year alone. This year, about 44,500 American women will die because of breast cancer. Only lung cancer causes more cancer deaths among women. . . .
 *Risk factors for breast cancer include being [a woman] older than 50, having a personal or family history of breast cancer. . . .*
 American Cancer Society, Facts on Breast Cancer 1 (1991) (emphasis added) (pamphlet available from American Cancer Society).

Def. Mem. at 8. Thus, according to Dr. Levine, Ms. Kekis was (and still is) in immediate need of treatment.

The traditional treatment for the type of breast cancer from which Ms. Kekis suffers is chemotherapy. Levine Aff. ¶ 4. Standard chemotherapy, however, is not considered a successful treatment for breast cancer of the degree suffered by Ms. Kekis. According to Dr. Levine, "despite adjuvant chemotherapy, the prognosis for patients who have extensive involvement of the axillary lymph nodes at the time of primary therapy remains poor." Levine Aff. ¶ 5. Dr. Levine cites to data from various studies indicating that 55% to 87% of women in Ms. Kekis's position suffer a relapse within five years of the initial diagnosis, despite receiving standard chemotherapy treatment. *See id.* Dr. Levine's figures comport with those provided in other sources, which similarly discuss the bleak success rates of standard chemotherapy for women in Ms. Kekis's position. *Cf., e.g., Bucci v. Blue Cross–Blue Shield, Inc.,* 764 F.Supp. 728, 730–31 (D.Conn.1991) (citing studies); *Adams v. Blue Cross/Blue Shield, Inc.,* 757 F.Supp. 661, 673–74 (D.Md.1991) (same); *see also* DiPersio Aff. (1/25/93) ¶ 12.; Pl. exh. "C" (article). In short, Ms. Kekis's oncologists are not optimistic about her chances of long term survival, even with standard chemotherapy. *See* Levine Aff. ¶ 5; *see also* DiPersio Aff. ¶ 10.

Given her "high risk" situation, Ms. Kekis's oncologists brought to her attention a relatively new adaptation to standard chemotherapy called High Dose Chemotherapy with Autologous Bone Marrow Transplantation ("HDC–ABMT"). In *Pirozzi v. Blue Cross–Blue Shield of Virginia,* one of many cases notably similar to the present case, the Eastern District of Virginia succinctly and accurately described the nature of HDC–ABMT, explaining:

> HDC–ABMT is a procedure by which bone marrow is extracted from the patient's body, frozen, and stored while the patient receives large, near lethal doses of chemotherapy. In some cases the chemotherapy is administered in doses in excess of one thousand times the standard dose. This high does chemotherapy kills not only the cancer, but much of the patient's remaining bone marrow, as well. This secondary effect, untreated, could well be lethal to the patient. Thus, after the chemotherapy is completed, the patient's stored bone marrow is returned to the patient's body to replace the damaged bone marrow and thereby "rescue" the patient. A patient undergoing HDC–ABMT is hospitalized, often in intensive care, for approximately 10 days of the treatment and requires full-time medical attention.

741 F.Supp. 586, 587 (E.D.Va.1990). *Accord, e.g., Nesseim v. Mail Handlers Benefit Plan,* 792 F.Supp. 674, 675 (D.S.D.1992); *Schnitker v. Blue Cross/Blue Shield,* 787 F.Supp. 903, 904–05 (D.Neb.1991); *see also, e.g.,* Def. exh. "Z" at 51–52 (article describing HDC–ABMT). Preliminary testing has suggested that HDC–ABMT *might* be more effective than standard chemotherapy in fighting recurrences of breast cancer. *E.g. Bucci,* 764 F.Supp. at 730–31; *White v. Caterpillar, Inc.,* 765 F.Supp. 1418, 1421 (W.D.Mo.1991); DiPersio Aff. ¶ 10 (citing studies). The efficacy of HDC–ABMT *vis-a-vis* standard chemotherapy is hardly settled, however, and is the subject of widespread controversy within the medical community. *See, e.g.,* Gary Taylor, *Cancer Treatment Focus of Suits,* N.L.J., Jan. 25, 1993, at 3.

Still, many doctors, including Ms. Kekis's oncologists, are encouraged by the promising preliminary data from HDC–ABMT research. At the urging of some of her doctors as well as family and friends, in the summer of 1992 Ms. Kekis actively sought to enroll in a HDC–ABMT research protocol. *See* Kekis Aff. ¶¶ 5–7. She initially sought to enroll in Dr. Levine's study at Roswell but was told that the program was full and that she could not be accommodated until October, 1992. *Id.* ¶ 7. She subsequently sought to enroll in a program offered by Strong Memorial Hospital at the University of Rochester ("Strong Memorial"). *Id.* ¶ 8. Strong Memorial's program, like the program at Roswell, was being conducted pursuant to a research protocol, under which the hospital was investigating the effectiveness of HDC–ABMT compared to standard chemotherapy. *Id.;* DiPersio Aff. ¶ 12. The director of the Strong

Memorial program, Dr. John DiPersio, determined that Ms. Kekis was eligible for participation in the study and thus allowed her to enroll in his program. DiPersio Aff. ¶ 9. Dr. Dipersio and Dr. Levine are hopeful that HDC–ABMT will provide Ms. Kekis with the good health and long life that would be so unlikely with standard chemotherapy.

Before finally permitting Ms. Kekis to receive HDC–ABMT, however, Strong Memorial required her to receive pre-authorization for the treatment from her insurance carrier. This requirement is not unusual; many other hospitals performing this procedure similarly require that the patient's insurer guaranty complete coverage before treatment begins. *See, e.g., Pirozzi,* 741 F.Supp. at 588. This prerequisite to treatment undoubtedly stems in part from the fact that HDC–ABMT is an unusually expensive procedure. The entire procedure can cost as much as $150,000.00. *See, e.g., Schnitker,* 787 F.Supp. at 905. Standard chemotherapy, by contrast, costs significantly less.

Dr. DiPersio wrote a letter on plaintiff's behalf to BC/BS on August 19, 1992, requesting pre-authorization for the procedure. *See* DiPersio Aff. exh. "C" (letter requesting pre-authorization). The letter explained the procedure that would be applied, including the fact that her treatment was to be given as part of a research protocol, that the procedure would undoubtedly be very expensive, and that immediate treatment was necessary because the tumor had been excised more than eight weeks earlier and there had to date been no follow-up treatment to prevent recurrence. *See id.* Dr. DiPersio attached to his letter a copy of the protocol under which Ms. Kekis would be treated.

### B. Denial of Coverage

Upon receiving Dr. DiPersio's letter, BC/BS referred the matter to its Medical Director, Dr. Fel Davies, who in turn reviewed the letter and the attached protocol. Dr. Davies also considered a supplemental package of materials sent by Strong Memorial regarding Ms. Kekis's proposed treatment. The supplemental package contained, *inter alia,* Ms. Kekis's medical records, office notes of her primary oncologist, further de-

scriptions of the study in which plaintiff sought to participate, and letters from other referring physicians relating to her condition and her need for HDC–ABMT. Dr. Davies discussed Ms. Kekis's request with colleagues in the insurance industry and consulted several published articles discussing HDC–ABMT. Upon considering all of this as well as substantial other information (to be discussed more thoroughly *infra* ), Dr. Davies concluded that BC/BS should not provide coverage for Ms. Kekis's treatment. BC/BS agreed and adopted Dr. Davies's conclusion.

BC/BS's decision not to pre-authorize Ms. Kekis's participation in Strong Memorial's protocol was based upon its application of an exclusion clause contained in Ms. Kekis's policy. Specifically, BC/BS relied upon a clause in the contract which excludes from coverage services which are "experimental/investigative." This clause states:

> In addition to certain exclusions and limitations already described in this rider, we will not pay under this rider when any of the following apply to you:
>
> . . . . .
>
> 18. **Experimental/Investigative Services.** We will not pay for any service or procedure we do not recognize as accepted medical practice as we determine has no proven medical value.

Def. exh. "A" at 12–14. Since BC/BS viewed Ms. Kekis's proposed treatment as experimental and investigative in nature, it determined that such treatment was excluded by this clause from coverage under the policy.

According to BC/BS, a number of factors supported its invocation of the "Experimental/Investigative Services" exclusion. The most compelling reasons allegedly came from Ms. Kekis's own doctors, most notably Dr. DiPersio. In his letter requesting pre-authorization, Dr. DiPersio frequently referred to Strong Memorial's HDC–ABMT program as a "study" in which patients are "randomized," so that only half of the patients receive HDC–ABMT and the other half receive stan-

dard chemotherapy. DiPersio Aff. exh. "C".[3] In the attached protocol, Dr. DiPersio made further reference to the study and randomization process and additionally noted that the hospital "would find it difficult ... to do a transplant off-study as *we simply do not know if this would be better or worse than conventional therapy.*" *See id.* (emphasis added). This letter and protocol immediately alerted Dr. Davies that Ms. Kekis's proposed treatment was likely experimental and investigative in nature.

The supplemental package that Strong Memorial sent to Dr. Davies for his consideration bolstered his initial impression. As mentioned above, the package included the office notes of Dr. Michael Spivey, Ms. Kekis's primary oncologist, in which Dr. Spivey described his conversations with Ms. Kekis and made special reference to his warnings concerning the investigational nature of HDC. Dr. Spivey wrote, in pertinent part:

> I had a fairly long discussion with [Ms. Kekis] and her husband as to conventional vs. investigational approaches.... I told her that I am completely in favor of considering a bone marrow transplant because simply we know the natural history of a person in her situation and it is totally feasible that a more aggressive approach might benefit her. *She does seem to understand that the use of marrow transplant in this situation is investigational.* To the best of my knowledge, there are certainly *no up-front studies comparing it to conventional therapy* although these are underway and I think she would be an excellent candidate for this.

Def. exh. "E" (emphasis added).

In a letter to Dr. Spivey, which was also included in Strong Memorial's supplemental package to Dr. Davies, Dr. Levine similarly described his conversations with Ms. Kekis, with specific regard to his warning "in no

uncertain terms of the experimental nature of this program" and that HDC–ABMT is a "non-traditional approach" to fighting recurrence. *See* Def. exh. "F". A written description of Strong Memorial's HDC–ABMT study, also reviewed by Dr. Davies, similarly details its investigative nature, explaining the purpose of the "trials" and "studies" in which patients participate. *See* Def. exh. "G" (asserting that "[f]urther research on HDC–ABMT [is] needed since other clinical studies of HDC–ABMT failed to demonstrate an improved quality of life and/or long term survival when compared to standard chemotherapy"). All of these assertions from Ms. Kekis's own physicians, in addition to his own, independent research into the acceptance of HDC–ABMT as a viable treatment, indicated to Dr. Davies, and ultimately BC/BS, that the proposed treatment was an "Experimental/Investigative Service" and thus excluded from coverage under the policy.

### C. Instant proceeding

BC/BS notified Ms. Kekis of its denial of coverage on August 28, 1992. By that time, Ms. Kekis had already enrolled in the protocol at Strong Memorial and was awaiting BC/BS's approval to proceed. During the next few months she sought to secure from alternative sources funding for the treatment, but to no avail. She subsequently retained her present counsel, who requested that BC/BS reconsider its refusal to preauthorize the treatment. *See* Def. exh. "M" (letter from attorney Koegel to BC/BS). BC/BS reviewed its determination and reaffirmed its conclusion that the treatment constitutes an "Experimental/Investigative Service" and is therefore excluded from coverage. Ms. Kekis then commenced this suit, alleging that BC/BS was obligated under the terms of the policy to provide coverage for her HDC–ABMT and that its refusal to comply violated section 502 of ERISA.[4] Ms.

---

3. In fact, at the time of Dr. DiPersio's letter, there was no guarantee that Ms. Kekis would be randomized to receive HDC–ABMT. Only after Dr. DiPersio sent his letter was Ms. Kekis randomized to receive the treatment. Had she not been randomized to receive HDC–ABMT, this case arguably never would have arisen.

4. This case arises under ERISA because Ms. Kekis's health insurance plan was established and maintained by her husband through his business, a gasoline station which is an "industry or activity affecting interstate commerce." Complaint ¶ 8; *see* ERISA §§ 3(1), (3), 4(a), 29 U.S.C. §§ 1002(1), (3), 1003(a); *see also* §§ 502(a)(1)(B), (a)(3), 29 U.S.C. § 1132(a)(1)(B), (a)(3).

Kekis also filed with the court an application for a preliminary injunction ordering BC/BS to immediately authorize and provide coverage for her participation in the program at Strong Memorial. It appears that granting preliminary relief would not moot this action; rather, if preliminary relief were granted, the issue would then shift to whether plaintiff should be required to reimburse BC/BS for its coverage. *Cf. Clark v. K-Mart Corp.*, 979 F.2d 965, 969 (3d Cir.1992) (discussing procedures which district court must follow after plaintiff receives HDC-ABMT pursuant to preliminary injunction).

## II. CONCLUSIONS OF LAW

■ To prevail on her application for a preliminary injunction, Ms. Kekis must satisfy the now familiar two pronged test articulated by the Second Circuit in *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir.1979). Specifically, Ms. Kekis must demonstrate both:

(1) either

(a) she is likely to succeed on the merits of her claim, or

(b)(i) she has raised sufficiently serious questions going to the merits of her claim to make them a fair ground for litigation; and

(ii) a balance of hardships tips decidedly in her favor;

(2) she will suffer irreparable harm if she is not granted the temporary relief she seeks.

*Id.* at 72, *cited in, e.g., Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 78 (2d Cir.1990); *Communications Wrkrs. of America v. NYNEX Corp.*, 898 F.2d 887, 891 (2d Cir.1990). The court will discuss Ms. Kekis's case with respect to each requirement *seriatim*.

### A. First prong: Likelihood of Success on the Merits or Questions going to the merits

i. Likelihood of Success on the Merits

*(a) Standard of review and burdens of proof*

■ Under any circumstance (*i.e.*, without the added complications to be described *in-*

*fra* ), Ms. Kekis, as the party seeking preliminary relief, would face a difficult burden in attempting to show likelihood of success on the merits. Given the gravity of the relief she seeks against BC/BS, as well as the fact that she seeks the relief before BC/BS has an opportunity to defend itself at a trial on the merits, it is not enough for her merely to show that she may have a "better argument" than BC/BS. Rather, Ms. Kekis must make a *clear* showing of likelihood of success on the merits. *College Entrance Examination Bd. v. Cuomo*, 788 F.Supp. 134, 138 (N.D.N.Y.1992). This burden is not overly intrusive under the circumstances because of the extraordinary, drastic nature of the preliminary relief she seeks. *E.g. Diversified Mortgage Investors v. U.S. Life Title Ins. Co.*, 544 F.2d 571, 576 (2d Cir.1976) ("preliminary injunction is an extraordinary remedy that should not be granted except upon a clear showing that there is a likelihood of success ..."); *see also Patton v. Dole*, 806 F.2d 24, 28 (2d Cir.1986). Thus, to prevail Ms. Kekis must satisfy a high burden. *Cf. Medical Soc'y v. Toia*, 560 F.2d 535, 538 (2d Cir.1977).

■ Ms. Kekis's task is made significantly more difficult by the terms of the BC/BS policy, which BC/BS undoubtedly drafted with an eye toward preventing lawsuits like the present. The exclusion clause upon which BC/BS relies gives BC/BS broad discretion to determine whether a proposed treatment is excluded from coverage. As stated above, the clause excludes from coverage any service or procedure *BC/BS does not recognize* as accepted medical practice, *as BC/BS determines* has no proven medical value. Def. exh. "A" ¶ 18. Since the policy unambiguously allows BC/BS—not the court—to determine what is "accepted medical practice" and whether a practice "has no proven medical value," the court cannot disturb BC/BS's decision to exclude coverage under this provision unless the decision was arbitrary and capricious. *E.g. Reichelt v. Emhart Corp.*, 921 F.2d 425, 431 (2d Cir. 1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991); *Seff v. National Org. of Indus. Trade Unions Ins. Trust Fund,* 781 F.Supp. 1037, 1040 (S.D.N.Y.1992).

In affording such deference to BC/BS's decision making process, the court follows the Supreme Court's instruction in *Firestone Tire and Rubber Co. v. Bruch* ("*Firestone*"), 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989), in which the Court ruled that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *See also, e.g., Heidgerd v. Olin Corp.*, 906 F.2d 903, 908 (2d Cir.1990). When the benefit plan gives the administrator discretion to determine eligibility for benefits, then the court must review that determination under the deferential "arbitrary and capricious" standard. *E.g. McDaniel v. Blue Cross and Blue Shield*, 780 F.Supp. 1363, 1364–65 (S.D.Ala.), *aff'd mem.*, 977 F.2d 599 (11th Cir.1992); *Adams*, 757 F.Supp. at 666 (citing cases). Since the plan here so unambiguously gives the administrator discretionary authority to determine eligibility for benefits, *de novo* review would be inappropriate. Instead, this court must defer to BC/BS's judgment and interfere with its decision to deny coverage only if the decision was arbitrary and capricious.

The difficult standard which Ms. Kekis must satisfy is somewhat lightened in at least one respect. Specifically, inasmuch as BC/BS purports to rely upon a policy exclusion to justify its denial of coverage, it (BC/BS) bears the burden of showing the applicability of that exclusion. Shifting the burden onto BC/BS is grounded in the settled doctrine that "[o]nce the insured shows that a [covered] loss has occurred, the insurer shoulders the burden of demonstrating that the loss claimed is excluded expressly from coverage under the policy terms." *M.H. Lipiner & Son, Inc. v. Hanover Ins. Co.*, 869 F.2d 685, 687 (2d Cir.1989); *accord, Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990). In *Colonial Tanning Corp. v. Home Indemnity Co.*, 780 F.Supp. 906, 918–19 (N.D.N.Y.1991), this court discussed this precise issue of which party must prove the applicability (or inapplicability) of an exclusionary clause and concluded that the burden rests squarely upon the insurer. The court is given no reason to believe that the shifting burden does not apply here, as well. Hence, at a trial on the merits, BC/BS would bear the burden of proving that its reliance upon the experimental/investigative services exclusion was not arbitrary and capricious.

Of course, this shifting burden does not relieve Ms. Kekis of her overriding burden in this motion of establishing a likelihood of success on the merits. When pieced together, these overlapping standards essentially place upon Ms. Kekis the burden of establishing the likelihood that BC/BS, at a trial on the merits, will not be able to justify its reliance upon the "Experimental/Investigative Services" exclusion. At the trial on the merits, BC/BS can justify its reliance upon the exclusion clause by showing that its decision to deny coverage pursuant thereto was not arbitrary and capricious. Therefore, to prevail on this prong of the preliminary injunction standard, Ms. Kekis must show that it is likely that BC/BS will not be able to prove at a trial on the merits that its decision to deny her coverage was not arbitrary and capricious.

### (b) Application

Having reviewed all of the evidence and applicable law in the context of the aforementioned standard, the court concludes that Ms. Kekis has carried her burden. She has convinced the court of the likelihood that BC/BS's refusal to provide coverage for her HDC–ABMT would, at a trial on the merits, be found arbitrary and capricious. More particularly, the court finds that the *procedure* that BC/BS employed in reaching its decision was arbitrary and capricious, *and* that the ultimate conclusion, regardless of the procedure used to reach it, was itself arbitrary and capricious as well. This finding is grounded in the application of this policy's coverage exclusion to this type of treatment. As will become apparent in the ensuing discussion, the court's analysis is of little (if any) precedential value to other claims, even those pending in this court, involving requests for coverage of HDC–ABMT.

#### (i) Arbitrary and capricious procedure

 BC/BS, as the fiduciary under ERISA of Ms. Kekis's health insurance plan, was bound to act only in accordance with the express terms of the policy. *See* ERISA § 404, 29 U.S.C. § 1104(a)(1)(D) (West Supp. 1992) ("Fiduciary duties"). As a fiduciary, BC/BS cannot disregard any policy requirement, nor can it implicitly incorporate into the policy any term that does not expressly appear. *See, e.g., Clarke v. Bank of New York,* 687 F.Supp. 863, 867 (S.D.N.Y.1988) (citing, *e.g., Miles v. New York State Teamsters Conf.,* 698 F.2d 593, 599 (2d Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983)); *see also Morgan v. Mullins,* 643 F.2d 1320, 1321 (8th Cir.1981). The fiduciary's duties are dictated by the policy, such that a fiduciary who ignores the terms of the policy and inserts its own terms acts arbitrarily and capriciously. *Cf., e.g., Kulakowski v. Rochester Hospital Serv. Corp.,* 779 F.Supp. 710, 716–17 (W.D.N.Y. 1991) (arbitrary and capricious for fiduciary "to ignore the language of [the Contract] and to insert a new exclusion . . . that no coverage would be provided for therapy which is 'investigational'" (quotation omitted) (citation omitted)); *Dozsa v. Crum & Forster Ins. Co.,* 716 F.Supp. 131, 139 (D.N.J.1989) (abuse of discretion for fiduciary to "appl[y] a different exclusion having different criteria from the Plan's exclusion").

When it reviewed Ms. Kekis's request for coverage, BC/BS applied the experimental/investigative services exclusion in a manner that was not provided for in the policy itself. While the policy gives BC/BS discretion to exclude from coverage those services and procedures which are "experimental/investigative services," the policy provides a strict, specific definition of what constitutes such services. The policy defines experimental/investigative services as "any service or procedure we do not recognize as accepted medical practice." *See* Def. exh. "A" ¶ 18. The policy then defines *that* term ("any service or procedure we do not recognize as accepted medical practice") as a service or procedure that BC/BS determines "has no proven medical value." *See id.* In short, the policy provides insureds such as Ms. Kekis a

working definition of experimental/investigative services: a procedure is experimental/investigative under the policy only if, in the view of BC/BS, the service or procedure has no proven medical value. If BC/BS determines that a service or procedure *does* have proven medical value, then the experimental/investigative exclusion clause does not provide a legitimate basis for denying coverage.

The court finds that BC/BS did not apply this definition of experimental/investigative services when it reviewed Ms. Kekis's request for coverage. The evidence revealed that BC/BS substituted its own definition of experimental/investigative services that differs from the definition set forth in the plan. In fact, BC/BS continued to apply its own, incorrect definition of experimental/investigative throughout these proceedings. Specifically, BC/BS erroneously applied the common, "dictionary" definition of experimental/investigative when it reviewed and denied Ms. Kekis's request for coverage, rather than the definition of experimental/investigative services set forth in its own policy. While the dictionary might provide the most widely accepted, reasonable definition of the words "experimental" and "investigative," the insurance policy provides the binding definition of those terms. The fact that the policy, which BC/BS drafted, carries an arguably uncustomary definition of experimental/investigative services is immaterial. *National Grange Mutual Ins. Co. v. Continental Casualty Ins. Co.,* 650 F.Supp. 1404, 1408 (S.D.N.Y.1986) ("exclusions from coverage 'must be specific and clear in order to be enforced. They are not to be extended by interpretation or implication, but are to be accorded a strict and narrow interpretation'" (citation omitted)). Since BC/BS, as fiduciary of Ms. Kekis's policy, applied a definition of experimental/investigative services that is not the definition mandated by the policy, BC/BS acted arbitrarily and capriciously when it relied upon this definition in denying her request for coverage. *Cf. Kulakowski,* 779 F.Supp. at 716–17; *Dozsa,* 716 F.Supp. at 139.

There are numerous indications in the record that BC/BS relied upon an impermissible standard when it refused Ms. Kekis's re-

quest. The most vivid evidence of this misapplication was presented in the testimony of Dr. Davies, BC/BS's medical director. Both Dr. Davies and Henry F. Becker, Vice President of BC/BS, testified that Dr. Davies enjoys broad discretion in making decisions concerning the legitimacy of proposed medical treatments. To the extent that Dr. Davies's recommendations involve medical judgments, they are generally left undisturbed by BC/BS management. Dr. Davies testified that he recommended rejection of Ms. Kekis's request because it was obvious that she would be participating in a "study" conducted under a research protocol. As an initial matter, Dr. Davies found the use of a protocol to be particularly significant because protocols, in his view, are generally used to describe an experiment using human subjects to be performed in furtherance of a larger study to investigate the effects of the treatment. *See* Def. Mem. at 40; Def. exh. "S" (excerpt from National Cancer Institute *Investigator's Handbook*, defining protocol as "the detailed written plan of a clinical experiment"). *Contra, e.g., Adams*, 757 F.Supp. at 675 (use of protocol does not mean that treatment is experimental); *Dozsa*, 716 F.Supp. at 138.[5]

Indeed, the information that Dr. Davies reviewed was replete with references, most conspicuously from Ms. Kekis's own oncologists, that she would be participating as part of a research program testing the efficacy of HDC–ABMT *vis-a-vis* standard chemotherapy, the results of which were not yet known. *See* Def. exh. "K" (package sent by Strong Memorial, including letters and protocol, described *supra* pp. 575–76). Moreover, Dr. Davies had read several published articles prepared by distinguished scientists, each stating that the value of HDC–ABMT compared to standard chemotherapy is unknown and still under investigation. *See, e.g.,* Def. Mem. at 31–37 (citing articles). Given that Ms. Kekis clearly proposed to be part of an investigation, and many of her own doctors—including Dr. DiPersio, who would supervise the procedure—confirmed the investigative nature of her plan, Dr. Davies concluded that her treatment constituted an experimental/investigative service that should be excluded from coverage.

No one can seriously question Dr. Davies's good faith in reaching his conclusion. His credentials are impressive, he testified sincerely and his conclusion regarding the experimental and investigative nature of Ms. Kekis's treatment—*under the ordinary definition of the terms "experimental" and "investigative"*—is substantiated by the affidavits of two other experts in the field. *See* Eddy Aff. (2/24/93) ¶ 15 ("it is my unequivocal opinion there was absolutely no medical evidence that the HDC/ABMT procedure as proposed for Michelene D. Kekis is anything but experimental"); Herberman Aff. (2/26/93) ¶ 23 ("it is my unequivocal opinion, based upon my years and training as a cancer researcher, that HDC/ABMT is experimental, and more importantly the particular procedure advanced by Dr. DiPersio and the University of Rochester is experimental"). His experience and credentials notwithstanding, Dr. Davies, as BC/BS's medical director, was bound to apply the *policy's* definition of experimental/investigative services, not his own definition or one supplied by experts in the field.

Dr. Davies clearly did not follow the standard mandated by the BC/BS policy when he reviewed Ms. Kekis's request for coverage. Instead, he considered numerous irrelevant factors, including evidence that she would receive treatment under a protocol and as part of an investigative study. All of these facts are immaterial to consideration of the only permissible inquiry: does HDC–ABMT have any proven medical value? If BC/BS found the answer to be yes, then it could not properly rely upon the experimental/investigative services clause to deny Ms. Kekis's request for coverage. While Dr. Davies

5. In rejecting an insurer's reliance upon the existence of a protocol to support its conclusion that HDC–ABMT is experimental, the court in *Adams* explained:

> many of today's accepted medical treatments are offered under a research protocol. Given the definition of "experimental" under the plan, the fact that the treatment is administered as part of an experimental protocol designed to facilitate the collection of data does not necessarily means that the treatment is by definition experimental.

757 F.Supp. at 675.

asked many other questions concerning the experimental nature of HDC–ABMT, he did not consider this fundamental question. Therefore, he did not review Ms. Kekis's request for coverage in accordance with the express terms of the policy, and his recommendation which was purportedly based upon the policy terms was arbitrary and capricious.[6] *See Dozsa,* 716 F.Supp. at 139.

The court's finding that Dr. Davies, and ultimately BC/BS, acted arbitrarily and capriciously in interpreting the policy follows the rulings in *Kulakowski v. Rochester Hosp. Serv. Corp., supra,* 779 F.Supp. 710, and *Dozsa v. Crum & Forster Ins. Co., supra,* 716 F.Supp. 131. In both of those cases, the defendant insurer relied upon an exclusion clause to deny the plaintiff's request for coverage for HDC–ABMT. In *Kulakowski,* the insurer relied upon its finding that the proposed treatment was "investigational" and thus excluded from coverage under the policy. *Kulakowski,* at 716.[7] The insurer's denial of coverage was peculiar, however, because the governing policy allowed an exclusion for "experimental" treatments but made no mention of excluding "investigational" treatments. *Id.* at 716–17. Since the insurer relied upon criteria—the treatment was investigational—that were not a legitimate basis for excluding coverage under the policy, the court found that the exclusion was arbitrary and capricious. *Id.*

The court in *Dozsa* was presented with an astonishingly similar situation. *See generally Dozsa,* 716 F.Supp. 131. After reviewing the insurer's denial of coverage in light of the policy provision upon which the insurer relied, the court concluded:

> [W]hat [the insurers] did in effect was to ignore the language of ... [the] Medical Plan and to insert a new exclusion. The new exclusion was that no coverage would be provided for therapy which is "investi-

gational" and therapy which is not backed by a consensus in peer reviewed medical literature is "investigational". That may very well be the terms of an exclusion in [the insurer's] own medical policies and in other medical plans which it administers. It is clearly not a basis for exclusion in the ... Medical Plan.

*Id.* at 138. Finding that the insurer had "applied a different exclusion having different criteria from the Plan's exclusion," the court in *Dozsa* concluded that the insurer had abused its discretion in denying coverage and that the insured was therefore likely to succeed on the merits of her claim. *Id.* at 139.

The rationale supporting the rulings in *Kulakowski* and *Dozsa* applies directly to the present case. The only basis upon which BC/BS legitimately could have denied Ms. Kekis's request for coverage under the experimental/investigative services exclusion would be by finding that HDC–ABMT "has no proven medical value." BC/BS did not make such a finding, however; instead, it denied Ms. Kekis's request under that exclusion based upon its belief that HDC–ABMT is "experimental" and "investigative" in the ordinary sense of those terms. BC/BS's reliance upon the fact that HDC–ABMT is experimental and investigative in nature was not a proper basis for denying Ms. Kekis coverage under the plan. Since BC/BS denied coverage for reasons not permitted in the policy, the denial was arbitrary and capricious. *Cf. Kulakowski,* 779 F.Supp. at 717; *Dozsa,* 716 F.Supp. at 139.

(ii) Arbitrary and capricious conclusion

Even if BC/BS had obeyed the policy terms and nevertheless decided to exclude coverage, the court still would find the denial to be arbitrary and capricious. While the precise efficacy of HDC–ABMT remains un-

---

**6.** The court notes in passing that Dr. Davies was not alone in imputing an incorrect meaning to the term "Experimental/Investigative Services." At the evidentiary hearing on Ms. Kekis's application, counsel to BC/BS similarly referred to a dictionary and the Code of Federal Regulations to define that term. In light of the express policy language, these references were irrelevant; the only appropriate definition of experimental/investigative services is that explicitly set forth in the policy, which is different than those set forth in counsel's other sources.

**7.** Plaintiff in *Kulakowski* sought to enter the same protocol at Strong Memorial that is at issue in this case. Dr. DiPersio's testimony played an important role in the *Kulakowski* decision, as well. *See Kulakowski,* 779 F.Supp. at 713–14.

der investigation, one cannot rationally conclude that HDC–ABMT is devoid of any proven medical value; it has been proven to have at least *some* medical value, however minute that value might be. Dr. DiPersio, who has performed or supervised HDC–ABMT on approximately 200 patients, including approximately forty with breast cancer, offered uncontradicted testimony that the procedure has proven to have at least some short-term value to patients receiving the treatment. The fact that Dr. DiPersio could not be certain of the long term value of HDC–ABMT is immaterial because the exclusion clause upon which BC/BS relies does not require that a given treatment have proven *long term* value to avoid exclusion; the only requirement is that the treatment have some proven medical value.

There is ample evidence to indicate that HDC–ABMT has some proven medical value. Dr. DiPersio persuasively testified at the hearing as well as in his affidavits that the treatment has shown encouraging response rates in women he has treated as well as in studies nationwide. *See, e.g.,* DiPersio Aff. (1/25/93) ¶ 10 ("HDC–ABMT has been *proven* to improve the objective response rate (*i.e.* the frequency that tumors are reduced or eliminated) in advanced breast cancer …" (emphasis added)). His findings comport with those of other experts engaged in this research who have similarly concluded that HDC–ABMT does have some proven medical value. *See, e.g., id.* exh. "B" (Duke University study). Courts throughout the country having spoken on the issue have also recognized that HDC–ABMT has at least *some* proven medical value. *See, e.g., Pirozzi,* 741 F.Supp. at 594 ("[t]here is ample evidence that [HDC–ABMT] results in tumor shrinkage and that tumor shrinkage correlates with increased survival"); *White,* 765 F.Supp. at 1421; *Bucci,* 764 F.Supp. at 730; *Adams,* 757 F.Supp. at 673–74; *Rollo v. Blue Cross/Blue Shield,* No. 90–597, 1990 WL 312647 *6, 9, 1990 U.S.Dist. LEXIS 5376 *4, 25 (D.N.J. Mar. 22, 1990). Significantly,

none of the cases upon which BC/BS relies even remotely suggested that HDC–ABMT is devoid of medical value.[8]

BC/BS's evidence does not contradict these findings. BC/BS's most compelling evidence relating to the medical value of HDC–ABMT was presented in the affidavit of Dr. David Eddy. Dr. Eddy, a biostaticisian from Duke University, is currently Senior White House Advisor to the President's Interagency Task Force on Health Care. He is well published and distinguished nationally in the field of health care policy. *See* Eddy Aff. (2/24/93) ¶ 2 & exh. "A" (curriculum vitae).[9] Dr. Eddy attested to HDC–ABMT studies generally and concluded that the benefit of HDC–ABMT compared to the value of standard chemotherapy is still unproven, and that the exact efficacy of HDC–ABMT is still being investigated. *See generally id.* His testimony is of little significance, however, because it does not address the central issue of this case, whether HDC–ABMT has "*no* proven medical value." Dr. Eddy's affidavit in this regard is limited to discussing whether HDC–ABMT is superior to standard chemotherapy, a consideration that is not relevant to determining whether the BC/BS exclusion clause should apply here. In fact, Dr. Eddy made this point abundantly clear in his discussion of the benefits of HDC–ABMT, asserting that determination of whether a treatment is beneficial turns on whether "the treatment provides greater improvement in health outcomes than alternative treatments." *Id.* ¶ 7.

Dr. Eddy implicitly offers a definition of "proven medical value" that differs from the definition utilized by the court in this discussion. He essentially asserts that a treatment has proven medical value only if it is better than the commonly-accepted treatments that currently exist. *See* Eddy Aff. ¶ 7. If a new treatment is inferior to an already existing treatment, contests Dr. Eddy, then it cannot be considered to have proven medical value. *See id.* While Dr. Eddy offers an insightful

---

8. Rather, the numerous cases cited by BC/BS address the question of whether HDC–ABMT is "experimental" or "investigational" under the generic definition of those terms, an inquiry which is irrelevant here.

9. *But see Adams,* 757 F.Supp. at 671 (critical of the probative value of Dr. Eddy's testimony in a case involving insurance coverage for HDC–ABMT).

interpretation of the term "proven medical value," his interpretation is immediately suspect for at least two reasons.

First, a construction offered by BC/BS of its own policy is immediately suspect because of the inherent conflict of interest under which BC/BS operates in rendering policy interpretations. The District Court for the District of Columbia recently discussed this conflict of interest problem in *Wilson v. Group Hospitalization and Medical Servs., Inc.*, 791 F.Supp. 309, 312 (D.D.C.1992). The court explained:

> The insurance carrier which both issues a policy and administers it occupies dual roles that create an inherent conflict of interest. In its fiduciary role, the insurance company interprets the plan, determining what expenses are covered. This fiduciary, however, is the same company that will ultimately pay for those expenses from its own coffers. Thus, the insurance company's "fiduciary role lies in perpetual conflict with its profit-making role as a business." The inherent conflict between the fiduciary responsibilities of the insurance carrier and its own financial interests renders the insurance carrier's interpretation of the plan suspect and requires that the Court scrutinize the carrier's interpretation with great care to determine whether the carrier acted free of self-interest.

*Wilson*, 791 F.Supp. at 312 (citations and footnote omitted) (citing *Brown v. Blue Cross & Blue Shield*, 898 F.2d 1556 (11th Cir. 1990)). The proposition in *Wilson* that an insurer which administers its own plan inherently creates a conflict of interest is not novel. Numerous other courts have similarly recognized the inherent conflict of interest and have consequently viewed insurance companies's constructions of their own policies, especially when such constructions work to the detriment of the policy holders, with suspicion. *E.g. Brown*, 898 F.2d at 1566–68; *Bucci*, 764 F.Supp. at 733. This court likewise concludes that BC/BS's profit motive, while not dispositive, seriously affects the weight that should be afforded to a policy interpretation offered by a BC/BS witness.

More importantly, it is emphatically within the province of the court—not a doctor—to interpret contractual terms that are litigated in court. To that end, this court's interpretation of "proven medical value," which favors Ms. Kekis, is guided by the Second Circuit's instruction that contract terms susceptible to multiple interpretations must be interpreted against the insurer, as the drafter of the policy language. *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 306 (2d Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988); *Westchester Resco Co. v. New England Reinsurance Corp.*, 818 F.2d 2, 3 (2d Cir.1987); *National Grange Mutual Ins. Co.*, 650 F.Supp. at 1408. The Second Circuit's direction favoring interpretation in favor of the insured, when coupled with the apparent conflict of interest under which BC/BS operates, compels the court to reject BC/BS witness's interpretation of what constitutes "proven medical value."

The court can accept all of Dr. Eddy's fact-based conclusions concerning the value of HDC–ABMT without affecting its previously discussed finding that HDC–ABMT has *some* proven medical value; Dr. Eddy did not refute this point. To the contrary, at one point in his affidavit Dr. Eddy acknowledged that "[t]he most optimistic finding is that complete response rates appeal to be higher in patients who receive HDC/ABMT than for patients who receive conventional dose chemotherapy." Eddy Aff. (2/25/93) ¶ 8.1. To the extent that Dr. Eddy asserts that the efficacy rate of HDC–ABMT compared to standard chemotherapy remains unknown and under investigation, the court finds that his conclusion is irrelevant.

In sum, data purporting to somehow *quantify* the value of HDC–ABMT is still unavailable, but it is also irrelevant. Similarly, BC/BS's substantial evidence indicating that HDC–ABMT has not proven to be more effective than standard chemotherapy is of no consequence. A BC/BS decision to exclude coverage on grounds that it is not the *best* treatment available would be arbitrary and capricious under the extant policy, because nowhere does the policy (or the exclusion) require that the proposed treatment reach a certain degree of value or be superior to the currently existing procedures in

order to have "proven medical value." To avoid the experimental/investigative exclusion, the insured need only show that HDC–ABMT has *some—i.e.* more than "no"—medical value that has been proven. *Cf. Zuckerberg v. Blue Cross and Blue Shield*, 108 A.D.2d 56, 487 N.Y.S.2d 595, 599–600 (2d Dep't 1985) (example of cancer treatment having *no* proven medical value). Ms. Kekis has easily satisfied that minimal standard here.

BC/BS's evidence, while voluminous, was directed almost entirely toward proving that HDC–ABMT is still under investigation and that its exact, long term effects are unknown. BC/BS offered no evidence to rebut Dr. DiPersio's convincing testimony that HDC–ABMT has at least some, albeit perhaps minor, medical value. Nor does the court believe that any reasonable evidence exists demonstrating that HDC–ABMT has *no* proven medical value. Accordingly, the court finds that BC/BC's refusal to provide Ms. Kekis coverage on grounds that HDC–ABMT has no proven medical value was arbitrary and capricious. Stated in procedural terms, Ms. Kekis is likely to prevail on the merits of her claim that BC/BS wrongfully denied her coverage for HDC–ABMT at Strong Memorial.

### 2. Questions going to the merits

The first prong of the preliminary injunction standard is disjunctive; the moving party need only prove *either* likelihood of success on the merits *or* sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See Haitian Centers Council Inc. v. McNary*, 969 F.2d 1326, 1338–39 (2d Cir.1992); *Jackson Dairy, Inc.*, 596 F.2d at 72. Since the court finds that Ms. Kekis has demonstrated a likelihood of success on the merits of her claim, she need not prove the alternative element of the first prong.

### B. *Second Prong: Irreparable harm*

The parties spent little time arguing the second prong of the preliminary injunction standard, irreparable harm, opting instead to concentrate their efforts on whether Ms. Kekis was likely to succeed on the merits of her claim. Interestingly, Ms. Kekis's ability to establish that she will suffer irreparable harm absent preliminary relief is closely related, if not intertwined, with her ability to show likelihood of success on the merits. For Ms. Kekis to establish that she will suffer irreparable harm but for the injunctive relief, as a matter of common logic she would have to demonstrate that the treatment of which she is being deprived would be of some proven medical value to her. That is to say, if Ms. Kekis proves that the absence of injunctive relief would deprive her of valuable medical treatment, then she has shown that she would suffer irreparable harm.

For the reasons discussed above, *see supra* pp. 581–84, the court is convinced, at least at this preliminary stage of the proceedings, that HDC–ABMT would have some medical value to Ms. Kekis. The consequence of this finding is that Ms. Kekis would be deprived of a valuable medical treatment if she is not given injunctive relief. Moreover, inasmuch as this deprivation would permanently affect her health (although the extent of this effect is unknown), it is not the type of deprivation that could be compensated with monetary relief in the future. *Cf. e.g., Borey v. National Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir.1991) ("when a party can be fully compensated for financial loss by a money judgment, there is simply no compelling reason why the extraordinary equitable remedy of a preliminary injunction should be granted"). It is significant in this regard that numerous other courts have found that a plaintiff suffering from breast cancer would suffer irreparable harm if she were not given HDC–ABMT. *Clark v. K–Mart Corp.*, 1992 WL 106935 *11, 1992 U.S.App. LEXIS 11543 *35–36 (3d Cir. May 22, 1992), *vacated as moot*, 979 F.2d 965, 969 (3d Cir.1992); *Wilson*, 791 F.Supp. at 313–14; *Kulakowski*, 779 F.Supp. at 717; *White*, 765 F.Supp. at 1423; *Dozsa*, 716 F.Supp. at 140. By contrast, no courts (as best this court can discern) have ruled that irreparable harm would *not* result from a denial of preliminary relief in this

context.[10] This court adopts the reasoning of the overwhelming authority indicating that a plaintiff in Ms. Kekis's position would suffer irreparable harm if she is not granted preliminary relief.

### III. CONCLUSION

Plaintiff has shown that she is likely to succeed on the merits of her claim and that she will suffer irreparable harm if her application for a preliminary injunction is denied. Therefore, plaintiff is entitled to the preliminary relief she seeks. Plaintiff's motion for a preliminary injunction is granted. Defendant is hereby ordered to provide insurance coverage for plaintiff's cancer treatment at the Bone Marrow Transplant Clinic at Strong Memorial Hospital, University of Rochester.

IT IS SO ORDERED.

10. As a practical matter, many courts ruling in favor of the insurer have not reached the issue of irreparable harm. Those courts generally found that the insured/plaintiff, given the language of the respective plan, was not likely to succeed on the merits of her claim. Therefore, the courts had no reason to discuss whether plaintiff could satisfy the irreparable harm prong of the preliminary injunction standard.