Penelope K. LEONHARDT and Michael J. Leonhardt, Plaintiffs,

v.

HOLDEN BUSINESS FORMS COMPANY, Holden Business Forms Group Health Plan, and Benepro, Inc., Defendants.

HOLDEN BUSINESS FORMS COMPANY, Third–Party Plaintiff,

v.

BRADFORD NATIONAL LIFE INSURANCE COMPANY and Lamar Life Insurance Company, Third–Party Defendants.

No. 3–93 CIV 304.

United States District Court,
D. Minnesota,
Third Division.

June 11, 1993.

Oppenheimer Wolff & Donnelly by Laurence M. Ulrich, and Jerome Miranowski, Minneapolis, MN, for plaintiffs.

Briggs and Morgan by Charles B. Rogers, Minneapolis, MN, for defendant/third-party plaintiff Holden Business Forms Co. and defendant Holden Business Forms Group Health Plan.

Mahoney & Hagberg, P.A. by Linda S. Jensen, Minneapolis, MN, for defendant BenePro.

Dorsey & Whitney by Daniel P. O'Keefe, Minneapolis, MN, for third-party defendants.

## ORDER

ALSOP, Senior District Judge.

This matter came before the Court on June 3, 1993, on the plaintiffs' motion for a preliminary injunction, the plaintiffs' motion for expedited discovery, and the third-party plaintiff's motion for a preliminary injunction. The plaintiffs ask this Court to preliminarily enjoin defendant Holden Business Forms Group Health Plan (the "Plan") from continuing to deny coverage for autologous bone marrow transplant ("ABMT") treatment for Penelope Leonhardt's multiple myeloma. The third-party plaintiff, Holden Business Forms Company ("Holden"), asks that, if this Court does enjoin the Plan, it also enjoin Holden's reinsurers, Bradford National Life Insurance Company ("Bradford") and Lamar Life Insurance Company ("Lamar") (collectively, the "Reinsurers"), from denying reinsurance coverage for Penelope Leonhardt's claim.

## I. FACTUAL BACKGROUND

### A. Introduction

Michael Leonhardt is a Holden employee and a participant in the Plan. His wife, Penelope Leonhardt, is a beneficiary of the Plan. Holden is the Plan sponsor and the Plan's designated administrator. BenePro, Inc. ("BenePro") is a third-party administrator hired by Holden to draft Plan documents and make claim determinations. To limit the Plan's exposure for large claims, Holden obtained "stop-loss" reinsurance from Bradford. Bradford's reinsurance obligations to

Holden were assumed by Lamar as of January 1, 1993. Under the terms of an Excess Loss Reinsurance Treaty (the "Reinsurance Treaty"), the Reinsurers are contractually obligated to indemnify the Plan for certain claims both incurred and paid by the Plan prior to the expiration date of the Reinsurance Treaty.

Penelope Leonhardt [1] ("Leonhardt") is a forty-eight year-old woman who was diagnosed in May of 1992 with multiple myeloma, a cancer of the bone marrow. (Leonhardt Aff. ¶¶ 3, 6.) Leonhardt's physician, Dr. Steven Rousey, ordered a combination of chemotherapy and radiation treatments, which failed to control her cancer. (Rousey Aff. ¶ 5; Leonhardt Aff. ¶ 7.)

Dr. Rousey referred Leonhardt to Dr. Bart Barlogie at the Arkansas Cancer Research Center. (Rousey Aff. ¶ 5.) Dr. Barlogie is a specialist in the treatment of multiple myeloma with autologous bone marrow transplants. (*Id.*) Dr. Barlogie met with Leonhardt, determined that she was a good candidate for ABMT treatment, and accepted her as a patient. (Rousey Aff. ¶ 8; Leonhardt Aff. ¶ 9.) Accordingly, Leonhardt began a regimen of chemotherapy in preparation for the first phase of the ABMT procedure. (Leonhardt Aff. ¶ 9.) The ABMT treatment is Leonhardt's only chance for long-term survival. Unless she receives this treatment, Leonhardt's cancer will continue to progress and take her life. (Rousey Aff. ¶ 9.)

## B. Autologous Bone Marrow Transplant Treatment

In *Dozsa v. Crum & Forster Ins. Co.,* the court succinctly described the ABMT treatment in the following manner:

ABMT is a medical technique for treating various types of cancer. It has been used extensively and effectively in treating leukemia, Hodgkin's Disease, lymphoma and breast cancer. More recently it has been used at a number of highly respected ABMT centers to treat multiple myeloma.

ABMT is a procedure pursuant to which a patient's bone marrow is removed and ... purified of cancer cells. Meanwhile the patient is given substantially greater levels of chemotherapy than he or she could have withstood if the bone marrow had remained in place. Thereafter the purified bone marrow is restored to the patient. Since there is a direct correlation between the level of chemotherapy administered to a patient and the curative or controlling effect of the chemotherapy, a patient who is able to withstand the higher level of chemotherapy has a higher likelihood of effectively controlling the disease. By performing ABMT, toxicity is avoided.

716 F.Supp. 131, 133 (D.N.J.1989); *see also, Kekis v. Blue Cross and Blue Shield of Utica–Watertown, Inc.,* 815 F.Supp. 571, 574 (N.D.N.Y.1993); (Rousey Aff. ¶ 6). The usual ABMT procedure includes diagnosis, chemotherapy in preparation for the treatment, bone marrow harvesting, intensive chemotherapy and radiation, and two transplants six to eight months apart. The cost for this entire process at the Arkansas Cancer Research Center is approximately $150,000–$200,000, exclusive of professional fees. (Ulrich Aff. Ex. 2.)

The ABMT procedure has been used with high dose chemotherapy in the treatment of multiple myeloma for a number of years and has proven to be an effective treatment. (Schwerkoske Aff. ¶ 4.) Studies have shown that traditional chemotherapy and radiation treatment of multiple myeloma achieves partial or complete remissions in seventeen to fifty-nine percent of the patients treated, with less than ten percent achieving complete remission. In contrast, high dose chemotherapy has achieved partial or complete remissions in eighty percent of the patients treated, with thirty percent achieving complete remission. (*Id.* ¶ 4, Ex. B, Ex. C.)

Several clinical factors establish Leonhardt as a good candidate for ABMT treatment. Leonhardt's cancer did respond to traditional chemotherapy, though not sufficiently to

---

1. Although Michael Leonhardt is also a named plaintiff in this lawsuit, the motion before the Court concerns the Plan's coverage of a proposed treatment for Penelope Leonhardt. Accordingly, the Court will refer to Penelope Leonhardt as an individual plaintiff throughout this opinion.

achieve even a partial remission. She is also relatively young and is otherwise in good health. (Rousey Aff. ¶ 8; Schwerkoske Aff. ¶ 13.)

Although Leonhardt is currently a good candidate for ABMT treatment, the procedure must be performed within the next several months to ensure the maximum opportunity for success. Time is of the essence in administering this treatment because of the "narrow window of time during which the treatment [can] be rendered." *Dozsa*, 716 F.Supp. at 133. Every delay lessons the likelihood of a successful outcome. Therefore, it is imperative that she continue her present course of treatment. (Rousey Aff. ¶ 8.)

## C. The Denial of Leonhardt's Claim

In accordance with the terms of the Plan, Leonhardt sought prior authorization for the proposed ABMT treatment from BenePro. By letter dated November 19, 1992, Sonja Thornes–McCohn, the Bone Marrow Transplant Patient Account Representative from Arkansas Cancer Research Center, requested verification of coverage. (Ulrich Aff. Ex. 2.)

BenePro rejected coverage for Leonhardt's proposed treatment by letter dated March 3, 1993. This letter, written by Anne Clark, stated that coverage for the treatment was being denied as "experimental for this patient's diagnosis." (*Id.* Ex. 3.)

On March 27, 1993, Leonhardt wrote to Clark at BenePro to appeal BenePro's denial of her claim. (*Id.* Ex. 4.) Shortly thereafter, on April 8, 1993, Leonhardt contacted attorney Jerome Miranowski regarding her appeal. (Miranowski Aff. ¶ 2.) On that same day, Miranowski contacted Anne Clark and informed her that he would be representing Leonhardt in her appeal. He also informed her that he would be submitting a written statement of Leonhardt's position on the appeal, once he received certain information from her. He asked Clark to send him all materials relied on to deny coverage, including articles and reports, as well as the identity of the Plan's reinsurers, the materials BenePro had regarding Leonhardt's condition and recommended treatment, and the

identity of the persons who would decide the appeal of her claim. Clark asked Miranowski to have Leonhardt confirm that he represented her before she sent him the requested information. (*Id.* ¶ 3.) Leonhardt called Clark on April 13, 1993, and confirmed that she was being represented by Miranowski. (Leonhardt Aff. ¶ 16.)

On April 28, Miranowski had not yet heard from Clark. On that day he faxed a letter to Clark reiterating his April 8 request for information and his intent to submit a written statement after he received the information. He also requested an opportunity to meet with the decision-makers. (Miranowski Aff. ¶ 5, Ex. A.)

BenePro denied Leonhardt's appeal in a letter dated April 29, 1993, written by Jane Berg, BenePro's Medical Review Director. (Ulrich Aff. Ex. 5.) The envelope carrying the letter was postmarked May 3, 1993. (*Id.* Ex. 6.) In her letter, Berg explained that coverage was being denied because the treatment was "investigational."

On May 5, Miranowski contacted Berg and asked her if the April 29 letter constituted BenePro's final position. Berg stated that it did. Miranowski asked Berg if she was aware of his previous conversation with Clark or his April 28 letter to Clark. Berg stated that she had not heard of his conversation with Clark, but she had heard that BenePro received a letter. Berg also stated that she thought BenePro had received Miranowski's letter after her letter had been mailed. Miranowski asked Berg to rescind the denial so that Leonhardt would have an opportunity to present her position on the appeal. Berg refused. (Miranowski Aff. ¶ 8.)

On May 14, Penelope and Michael Leonhardt filed this lawsuit. On that same day, Holden and the Plan were served. On May 18, BenePro was served. On May 26, Linda Jensen, BenePro's attorney, responded to Miranowski's original requests for information. (Jensen Aff. Ex. 2.)

## D. The Holden Business Forms Group Health Plan

The Plan covers "Usual and Customary charges" for medical care "recommended by

a Physician and performed for the treatment of an Illness." (Ulrich Aff. Ex. 1 at 23.) The term "illness" is defined simply as a "disease." (*Id.* at 18.)

The Plan excludes coverage for "[e]xperimental ... treatments, procedures and therapies." (*Id.* at 31.) "Experimental" is defined in the Plan as

> any medical procedure ... treatment or course of treatment ... which is (a) not proven in an objective manner to have therapeutic value or benefit, (b) restricted to use at medical facilities capable of carrying out scientific studies; or (c) of questionable medical effectiveness.

(*Id.*) The Plan also lists various sources of information it deems relevant to a determination of whether a treatment or procedure is experimental.

> To determine whether a procedure is experimental, this Plan will consider among other things: commissioned studies; and opinions and references to or by the American Medical Association, the Federal Drug Administration, the Department of Health and Human Services, the National Institute of Health, the Council of Medical Specialty Societies, and any other association or Federal program or agency that has the authority to approve medical testing or treatment.

(*Id.*) The Plan does not contain an exclusion for "investigational" treatments.

The Plan enumerates the following procedures for denying claims and resolving appeals:

> In the event a claim is denied, you will be advised of the following:
>
> 1) The reason for the denial;
>
> 2) Specific references to Plan provisions on which the denial was based, and
>
> 3) Any additional material or information necessary for further review of the claim.
>
> If your claim is denied, you may appeal the denial by making a written request for review to BenePro at the address in the front of this booklet, at the time notice of denial was received. In connection with review, you have the right to:

> 1) Argue against the denial in writing, and
>
> 2) Have a representative act on your behalf in the appeal.

(*Id.* at 39.)

The Plan grants the plan administrator "full, final and exclusive authority to determine all questions of coverage and eligibility with regards [sic] to this Plan, to construe the provisions of this Plan, and to interpret the terms of this Plan." (*Id.* at 37.) Holden is identified as the Plan administrator. (*Id.* at 40.) However, as previously explained, Holden retained BenePro as a third-party administrator to make claim determinations.

## II. ANALYSIS

### A. Leonhardt's Motion for a Preliminary Injunction

The Court first must determine which defendant or defendants are the proper subject of Leonhardt's requested injunction. Leonhardt's Complaint asserts five separate counts under the Employee Retirement Income Security Act ("ERISA") against the various defendants. Count I is brought under 29 U.S.C. § 1132(a)(1)(A) and alleges that the defendants failed to respond to requests for information as required under 29 U.S.C. § 1132(c). Count II is brought under 29 U.S.C. § 1132(a)(1)(B) and alleges that the defendants wrongfully denied Leonhardt benefits due to her under the Plan. Count III is brought under 29 U.S.C. § 1132(a)(2) and alleges that Holden and BenePro, as fiduciaries of the Plan, breached their fiduciary duties to the Plan. Count IV is brought under 29 U.S.C. § 1132(a)(3) and alleges that Leonhardt is entitled to injunctive or other appropriate equitable relief to remedy the defendants' wrongful conduct. Count V alleges that the defendants failed to grant Leonhardt a "full and fair review" of her claim in violation of 29 U.S.C. § 1133(2).

■ Leonhardt is asking this Court to enjoin the defendants from denying coverage for her proposed ABMT treatment. This is, substantively, a request for "benefits due" under 29 U.S.C. § 1132(a)(1)(B). Under ERISA, a "money judgment ... against an employee benefit plan shall be enforceable

only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity." 29 U.S.C. § 1132(d)(2). Thus, if a final determination is eventually made that Leonhardt is entitled to coverage under section 1132(a)(1)(B), the Plan will be responsible for paying for the treatment. Holden, as the Plan sponsor, may be liable for any deficiency created by that coverage. *See* 29 U.S.C. § 1362. Moreover, Holden and BenePro may be liable to the Plan for any loss to the Plan caused by a breach of fiduciary duty. *See* 29 U.S.C. §§ 1105, 1109. It is the Plan, however, that is responsible for providing coverage, and, therefore, the Plan is the proper subject of Leonhardt's proposed injunction.

The following four factors are relevant in determining whether Leonhardt is entitled to a preliminary injunction against the Plan: 1) the threat of irreparable harm to Leonhardt; 2) the state of the balance between this harm and the injury that granting the injunction will inflict on the defendants; 3) the probability that Leonhardt will eventually succeed on the merits; and 4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (en banc). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Pub. Co. v. Mead Data Cent., Inc.,* 799 F.2d 1219, 1222 (8th Cir. 1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987).

### 1. *The Threat of Irreparable Harm to Leonhardt*

■ Unless Leonhardt receives the ABMT treatment, her cancer will continue to progress and take her life. With the ABMT treatment, Leonhardt has a reasonable possibility of a long-term remission or cure of the cancer.[2] It is imperative that Leonhardt continue her present course of treatment and undergo the ABMT treatment within the next several months to ensure the maximum chance for success. Therefore, under the first factor, the Court finds that Leonhardt will suffer irreparable harm if the Plan continues to deny coverage for the ABMT treatment. *See, e.g., Kekis v. Blue Cross and Blue Shield of Utica–Watertown, Inc.,* 815 F.Supp. 571, 584 (N.D.N.Y.1993) (deprivation of a valuable medical treatment (ABMT) would permanently affect plaintiff's health and constituted irreparable harm); *Kulakowski v. Rochester Hosp. Serv. Corp.,* 779 F.Supp. 710, 717 (W.D.N.Y.1991) (plaintiff needed ABMT treatment promptly, before her physical condition deteriorated to the point where such treatment was impossible).

### 2. *The Balance of Harms*

Under the second factor, the irreparable harm Leonhardt will suffer if the Plan continues to deny coverage must be balanced against the harm the various defendants will suffer if the injunction is issued. The Court understands that the issuance of a preliminary injunction will, in effect, largely act as a final determination on the merits. If the Plan is enjoined from denying coverage and it is later determined that Leonhardt is not entitled to coverage, there is little chance that the Plan or Holden will be able to recoup their losses.[3] Due to Leonhardt's limited financial resources, she is unable to post a bond to cover the full cost of the ABMT treatment.

The Court is not unmindful of Holden's dilemma, but suggests that its present circumstance is largely the result of its own conduct or that of its designee, BenePro. Leonhardt originally sought authorization for this treatment on November 19, 1992, nearly seven months ago. BenePro waited until March 3, 1993, to reject Leonhardt's claim.

---

**2.** In oncological terms, a "cure" is defined as complete remission for a period of five years. (Schwerkoske Aff. ¶ 6.)

**3.** Holden's reinsurance coverage does not change the potential for harm to Holden. The Reinsurers could deny reinsurance coverage for a variety of reasons, including the fact that the Reinsurance Treaty and the Plan contain different definitions of "experimental." If the Reinsurers did provide reinsurance coverage for Leonhardt's treatment, they would surely seek reimbursement from Holden upon a final determination that the treatment was not covered by the Plan. Either way, Holden and the Plan would suffer the loss.

Her appeal was rejected on May 3, 1993. Moreover, the defendants' potential harm is purely economic, while the irreparable harm threatening Leonhardt goes well beyond financial loss. *See, e.g., Wilson v. Group Hospitalization and Medical Servs., Inc.,* 791 F.Supp. 309, 314 (D.D.C.1992) (discounting a harm that was "strictly financial"). Accordingly, the Court finds that the balance of harms tips in favor of Leonhardt.

### 3. *Leonhardt's Probability of Success on the Merits*

Holden argues that Leonhardt has little probability of succeeding on the merits because the decision to deny her coverage is entitled to deferential review and was not an abuse of discretion. Leonhardt argues that the decision to deny her coverage should be reviewed *de novo* and that, regardless of which standard of review is applied, she is likely to succeed on the merits because the decision was clearly an abuse of discretion. Before the Court can determine Leonhardt's probability of success on the merits, several preliminary issues require resolution.

#### a. *Standard of Review*

■ First, the Court must determine the appropriate standard of review for the denial of Leonhardt's claim. Prior to 1989, a deferential "arbitrary and capricious" standard of review was applied in the Eighth Circuit to all decisions made by ERISA plan administrators. *See, e.g., Niagara Paper Corp. v. Paper Indus. Union Management Pension Fund,* 800 F.2d 742, 745–46 (8th Cir.1986). In 1989, however, the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). Therefore, if the plan vests the administrator or fiduciary with the authority to determine eligibility for benefits or to construe the terms of the plan, a court applies a deferential standard of review to the administrator's determinations. *Id.; Cox v. Mid-American Dairymen, Inc.,* 965 F.2d 569, 571 (8th Cir.1992).

■ The Plan grants its administrator "full, final and exclusive authority to determine all questions of coverage and eligibility." Therefore, the decision to deny coverage is entitled to deferential review by this Court. In *Cox,* the Eighth Circuit determined that the proper standard of deferential review is an "abuse of discretion" rather than "arbitrary and capricious," which had previously been applied. 965 F.2d at 572. However, the Court noted that the two standards probably presented "a distinction without a difference." *Id.* at 572 n. 3.

#### b. *The Decision to Deny the Claim*

■ Next, the Court must determine what decision is entitled to deferential review. Leonhardt argues that BenePro, rather than Holden, denied her claim for coverage even though the Plan grants Holden the authority to determine all questions of coverage. Therefore, Leonhardt argues, Holden is not entitled to discretionary review of a decision that it never made. The Court rejects this argument. Holden delegated responsibility for coverage determinations to BenePro, and BenePro was acting as the Plan administrator when it made the decision to deny Leonhardt's claim. *See Dozsa,* 716 F.Supp. at 133. Holden admits that it is responsible for BenePro's decisions. (Transcript of June 3, 1993 Hearing at 38.) Therefore, Holden is entitled to discretionary review of BenePro's decision. BenePro's decision became final when it denied Leonhardt's appeal by letter dated April 29, 1993.

#### c. *Scope of Review*

■ Finally, the Court must determine the proper scope of its review. When reviewing an administrator's decision under the deferential standard, a court is limited in evidentiary scope to the evidence before the administrator at the time the decision was made. *See Cox,* 965 F.2d at 573 n. 4. (8th Cir.1992) ("We review the actions of ERISA fiduciaries ... based upon the evidence that was before them."); *Oldenburger v. Central States Southeast and Southwest Areas Teamster Pension Fund,* 934 F.2d 171, 174

(8th Cir.1991) (court's review limited "to the evidence that was before [the administrator] when the final decision was made"); *Short v. Central States Southeast & Southwest Areas Pension Fund,* 729 F.2d 567, 571 (8th Cir. 1984) ("[I]n reviewing a decision of the Trustees, a federal court is not to hold a *de novo* factual hearing which would allow for the admission of new evidence.... Rather, the court must focus on the evidence which was before the Trustees when the final decision was made."). Accordingly, the scope of the Court's initial review is limited to the evidence actually considered by BenePro.

■ After Leonhardt brought this lawsuit, Holden's attorneys assembled various affidavits and exhibits in support of BenePro's original decision. However, none of this information was considered by BenePro when it denied Leonhardt's claim. Therefore, it cannot be considered by the Court at this initial stage of review. The Eighth Circuit has criticized this type of after-the-fact rationalization, stating that a

> *post hoc* attempt to furnish a rationale for a denial of ... benefits in order to avoid reversal on appeal, and thus meaningful review, diminishes the integrity of the [Plan] and its administrators. ERISA and its accompanying regulations were intended to help claimants process their claims efficiently and fairly; they were not intended to be used by the [Plan] as a smoke screen to shield itself from legitimate claims.

*Short,* 729 F.2d at 575; *see also, Lutheran Medical Ctr. of Omaha, Nebraska v. Contractors, Laborers, Teamsters and Eng'rs Health and Welfare Plan,* 814 F.Supp. 799, 808 (D.Neb.1993) (awarding attorney's fees in a "case [that] presented the same type of *post hoc* rationalization found improper in *Short* ").

At oral argument, the Court expressed its concern over the proper scope of review of a plan administrator's decision in light of the Eighth Circuit's recent decision in *Bernards v. United of Omaha Life Ins. Co.,* 987 F.2d 486 (1993). In *Bernards,* the plaintiff also sought coverage for ABMT treatment. The insurer denied coverage on the grounds that the ABMT treatment was "investigational."

Although the term "investigational" was not defined in the health care plan at issue, the plan gave the administrator "the discretion and final authority to construe and interpret the [plan]." 987 F.2d at 488. Therefore, the administrator's determination that the proposed treatment was investigational was entitled to deferential review.

The district court in *Bernards* determined that the administrator's decision was arbitrary and capricious and granted summary judgment for the plaintiff. The Eighth Circuit reversed, stating that

> We agree with the district court that [the administrator's] cryptic letters denying benefits failed to provide a sufficient rationale to permit judicial review of its decision. The district court erred, however, in going on to conduct an independent, effectively de novo review of the evidence. In particular, the district court erred in devising its own interpretation of the policy term, *investigative.* As we held in *Cox,* when the plan administrator fails to give an adequate explanation of how it has construed the plan and applied it to the facts of a particular claim, the reviewing court must seek a fuller explanation from the administrator and then apply the deferential standard of review on an adequate record to determine whether the decision is extraordinarily imprudent or extremely unreasonable.

> \*　　\*　　\*　　\*　　\*　　\*

> In *Cox* we remanded to the district court with directions that the case be remanded to the plan administrator. This case is more complicated, however, because the emergency situation has caused the parties ... to seek immediate judicial review. To conduct meaningful review in these circumstances, the district court must obtain from [the administrator] a further explanation of its decision, afford [the plaintiff] the opportunity to present evidence challenging the decision ..., and then apply the deferential standard of review to the expanded record.

987 F.2d at 488–89 (footnotes and citations omitted). Therefore, *Bernards* teaches that a district court conducting deferential review

should allow the plan administrator to present evidence of how it has construed and applied the provisions at issue. The claimant is then allowed to present evidence challenging the administrator's decision.[4]

■ In this case, the Plan defines the term "experimental." BenePro has submitted an affidavit from Jane Berg that explains what information BenePro considered in denying Leonhardt's original claim and her appeal. This information is properly before the Court in its determination of whether Bene-Pro's decision was an abuse of discretion. Neither BenePro nor Holden claim that the additional information, which was gathered by Holden's attorneys after this lawsuit was filed and submitted to the Court, sheds any light on how BenePro interpreted the term experimental and applied it to Leonhardt's claim at time it denied coverage.

### d. Application of the Deferential Standard of Review

■ Accordingly, BenePro's decision to deny Leonhardt coverage must be affirmed by this Court unless it concludes that the decision constituted an abuse of discretion. Application of the abuse of discretion standard involves a determination of whether the BenePro's decision was supported by substantial evidence. *See Jader v. Principal Mut. Life Ins. Co.*, 723 F.Supp. 1338, 1341 (D.Minn.1989).[5] If an administrator's action is extraordinarily imprudent or extremely unreasonable, a court is likely to find that there has been an abuse of discretion. *Cox*, 965 F.2d at 572. The Court finds that Bene-Pro's decision was an abuse of discretion. In denying Leonhardt's claim, BenePro failed to follow the terms of the Plan, violated ERISA law, ignored Department of Labor regula-

tions, and relied on insufficient and inconclusive information.

The Plan states that, in the event a claim is denied, the claimant will be advised of the reason the claim was denied and the specific Plan provisions on which the denial was based. The claimant is also to be advised of any additional information necessary for further review.

ERISA also regulates the denial of benefits claims. Section 503 of ERISA provides:

In accordance with regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133. In addition to these statutory requirements, the Department of Labor has promulgated regulations that require plan administrators to

provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:

(1) The specific reason or reasons for the denial;

(2) Specific reference to pertinent plan provisions on which the denial is based;

(3) A description of any additional material or information necessary for the claimant to perfect the claim and an

---

4. *Bernards* does not authorize the type of *post hoc* rationalization previously criticized by the Eighth Circuit. Such a reading of *Bernards* is foreclosed by an examination of the court's opinion in *Cox*, 965 F.2d at 573. In *Cox*, the court stated that "[w]e review the actions of ERISA fiduciaries such as the Retirement Committee based upon the evidence that was before them." *Id.* at n. 4 (citing *Oldenburger*, 934 F.2d at 174). Nine months later, the court issued its opinion in *Bernards*. Judge Loken, the author of *Cox*, was also on the panel that issued the per curiam decision in *Bernards*. Therefore, this Court con-

cludes that, if the Eighth Circuit had intended to expand the proper scope of review in *Bernards*, it would have expressly done so.

5. As previously noted, the Eighth Circuit has stated that, although the proper deferential standard of review is abuse of discretion rather than arbitrary and capricious, the two standards present "a distinction without a difference." *Cox*, 965 F.2d at 572 n. 3. Accordingly, the Court will not attempt to distinguish between the two standards when citing authorities.

explanation of why such material or information is necessary; and

(4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

29 C.F.R. § 2560.503–1(f).

In its March 3 letter denying Leonhardt's original claim, BenePro stated that

Our medical review board and medical consultant have reviewed this pre-treatment request. We have also obtained information from the American Cancer Society on this request.

We regret that we must deny the treatment as experimental for this patient's diagnosis. . . .

Should you have any information regarding approval of this treatment for this diagnosis, please send it to us and we will be happy to review this procedure again.

In its April 29 letter denying Leonhardt's appeal, BenePro stated that

We contacted the American Medical Association who referred us to the American Society of Clinical Oncology. Their current determination of this procedure for multiple myeloma is that they are currently reviewing protocol and in the process of conducting clinical trials.

Since your plan excludes benefits for investigational treatment, we would not be able to provide benefits for this procedure.

The April 29 letter cites a nonexistent exclusion in the Plan as the basis for the denial of coverage. Neither letter gives specific references to Plan provisions. These deficiencies violate both the terms of the Plan and the administrator's obligation under ERISA. *See Vanderklok v. Provident Life and Accident Ins. Co.*, 956 F.2d 610, 615–17 (6th Cir.1992); *White v. Jacobs Eng'g Group Long Term Disability Benefit Plan*, 896 F.2d 344, 349–50 (9th Cir.1989); *Short*, 729 F.2d at 575; *Jader*, 723 F.Supp. at 1341. Specifically, courts have rejected "conclusory statements regarding a claimant's ineligibility for benefits." *White*, 896 F.2d at 349 (collecting

cases); *accord Short*, 729 F.2d at 575 (rejecting "[b]aldfaced conclusions"). BenePro's failure to cite specific Plan provisions denied Leonhardt the "opportunity to comprehend fully the reason for the denials and to know what deficiencies [her application had to] overcome to be successful on appeal." *White*, 896 F.2d at 350. Similarly, although the March 3 letter invites Leonhardt to submit additional "information regarding the approval of this treatment for this diagnosis," (Ulrich Aff. Ex. 3), it "does not contain explicit information as to the steps to be taken if [Leonhardt] wished to submit h[er] claim for review, nor is there any indication of what additional proof might be required." *Vanderklok*, 956 F.2d at 616. When faced with these types of procedural deficiencies, federal courts have repeatedly found that there has been an abuse of discretion. *See, e.g., Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir.1993); *Short*, 729 F.2d at 575; *Jader*, 723 F.Supp. at 1341.

■ Even more disturbing than the deficiencies in the notices denying Leonhardt's claim and appeal is BenePro's disregard for Leonhardt's right to submit written argument on her behalf and to be represented by an attorney in the appeal process. This disregard violated both the express terms of the Plan and Leonhardt's right under ERISA to a "full and fair review . . . of the decision denying the claim." 29 U.S.C. § 1133.

The circumstances surrounding Leonhardt's appeal suggest that BenePro acted in bad faith with regard to these rights. BenePro was contacted by Miranowski, Leonhardt's attorney, on April 8, 1993, shortly after she filed her appeal. Miranowski told BenePro that he would be submitting a written statement on Leonhardt's behalf and asked BenePro to supply various information regarding her claim.[6] Three weeks later, on April 28, not having received the information, Miranowski faxed BenePro a letter reiterating his request for information and his intent to submit a written statement on Leonhardt's behalf. BenePro denied Leonhardt's appeal

6. Leonhardt was entitled to this information because it was necessary for a "full and fair review" under 29 U.S.C. § 1133.

in a letter dated one day later, on April 29, but postmarked on May 3. Miranowski subsequently contacted Jane Berg at BenePro and was told that she thought his letter had come after the denial had been mailed. Berg refused to rescind the denial, and BenePro did not supply the information Miranowski requested until May 26, eight days after it was served with Leonhardt's complaint.

BenePro's disregard for Leonhardt's right to have an attorney submit written argument on her behalf undermined the appeals process in two important ways. First, Leonhardt was denied the opportunity to submit evidence in support of her position that the ABMT treatment does not fall within the Plan definition of experimental.[7] Second, Leonhardt was denied the opportunity to challenge the information BenePro relied on in concluding that ABMT treatment is experimental.

■ BenePro relied on information from the American Cancer Society, Dr. Charlotte Lee, and the American Society of Clinical Oncology in support of its decision to deny Leonhardt's claim. (Berg Aff. ¶¶ 2–3.) BenePro states that it was "advised by the American Cancer Society that the proposed treatment for this diagnosis was experimental." (*Id.* at ¶ 2.) On June 2, 1993, one of Leonhardt's attorneys, Erika Koster, spoke with Marge Carter at the American Cancer Society. Carter told Koster that the American Cancer Society has no literature from which an insurer could conclude that ABMT is experimental. Carter further stated that members of the American Cancer Society are volunteers, not physicians, and, therefore, it would have been improper for someone from the American Cancer Society to advise an insurer that ABMT is an experimental treatment. (Koster Aff. ¶ 6.)[8]

BenePro describes Dr. Lee as "an internist and consultant, who is an expert in the insur-

ance field, in medical determinations." (Berg. Aff. ¶ 2.) However, as Leonhardt points out, Dr. Lee is apparently not board-certified in either oncology or hematology. Furthermore, there is no indication that Dr. Lee was aware of the Plan definition for "experimental" or that she had reviewed Leonhardt's medical records. Finally, BenePro states that it "was advised that [the American Society of Clinical Oncology] is currently reviewing the protocol for autonomous bone marrow ("ABM") transplants for myelomas and that the treatment is still considered experimental." (*Id.* at ¶ 3.) There is nothing in Berg's affidavit suggesting that this unnamed individual at the American Society of Clinical Oncology was qualified to give this opinion or that the individual was aware of the Plan definition for experimental. Furthermore, "the fact that the treatment is administered as part of an experimental protocol designed to facilitate the collection of data does not necessarily mean that the treatment is by definition experimental." *Adams v. Blue Cross/Blue Shield of Maryland, Inc.,* 757 F.Supp. 661, 675 (D.Md.1991); *Dozsa,* 716 F.Supp. at 138–39.

■ The Court has little difficulty concluding that BenePro's decision constituted an abuse of discretion. Normally, when a plan administrator "fails to follow procedural steps or fails to consider the evidence available to it, the proper course is to remand the matter to the plan ... for reconsideration." *Jader,* 723 F.Supp. at 1342; *accord Weaver,* 990 F.2d at 159; *Cox,* 965 F.2d at 574. "No remand is necessary, however, where it would be a useless formality." *Wolfe v. J.C. Penney Co.,* 710 F.2d 388, 394 (7th Cir.1983); *accord Bernards,* 987 F.2d at 489; *Vanderklok,* 956 F.2d at 617; *White,* 896 F.2d at 352 n. 2.

---

**7.** Leonhardt presented some information to BenePro on her own initiative, without the assistance of counsel. Apparently, this information consisted of a list of insurance companies that have paid for bone marrow transplants and a journal article co-authored by Dr. Barlogie. (Jensen Aff. Ex. 2.) However, with the assistance of counsel, Leonhardt has assembled additional information and, equally as important, or-

ganized the information into an effective presentation.

**8.** Two separate documents were filed with the caption "AFFIDAVIT OF ERIKA S. KOSTER." Both documents are dated June 2, 1993. The Court is referring to the longer, three-page affidavit and will not refer to the shorter affidavit in this opinion.

■ The facts of this case strongly suggest that a remand to the Plan would be inappropriate. First, a quick resolution of this matter is essential to Leonhardt because further delay in obtaining the treatment would decrease the likelihood of a successful result. *Cf. Bernards*, 987 F.2d at 489 (immediate judicial review rather than a remand justified by an "emergency situation"). Furthermore, BenePro's prior conduct calls into question its ability to process Leonhardt's claim impartially. Under these circumstances, the equities weigh strongly against remanding this matter to the Plan. *See White*, 896 F.2d at 352 n. 2 ("equitable considerations" excuse the requirement that a claim be remanded to the plan).

The Sixth Circuit recently offered the following commentary in a similar situation:

Because [the administrator] failed to give appropriate notice, it is not entitled to the protections concerning administrative review which form the basis of [the remand requirement]. In the present case, plaintiff was not given the opportunity to present additional evidence to [the administrator] in an administrative appeal because [the administrator] failed to follow the statutory notice requirement. The failure to follow administrative review procedures was [the administrator's], not plaintiff's. Therefore, we do not believe it is necessary to require that plaintiff first submit additional evidence to [the administrator] before bringing an appeal before the district court. We agree with plaintiff that the appropriate remedy is to remand to the district court with instructions to reconsider the issue of disability after plaintiff has been given the opportunity to submit additional evidence.

*Vanderklok*, 956 F.2d at 617. In this case, BenePro failed to give Leonhardt proper notice of its denial of her claim, disregarded Leonhardt's right to have an attorney present a written statement on her behalf, and failed to provide relevant information until after the appeal was denied and this lawsuit was filed. Under these circumstances, the Court chooses to exercise its discretion not to remand to the Plan.

■ At this stage of review, having concluded that a remand to the Plan is inappropriate, the Court essentially steps into the shoes of the Plan administrator and makes a *de novo* determination of whether Leonhardt's proposed ABMT treatment is experimental under the Plan definition. Presumably, on remand, both parties would be entitled to submit additional evidence in support of their position. Therefore, at this stage of review, the Court will consider the additional evidence submitted by both Leonhardt and the defendants. *Cf. Donatelli v. The Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir.1993) ("If it is necessary for adequate *de novo* review of the fiduciary's decision, the district court may allow the parties to introduce evidence in addition to that presented to the fiduciary.").

The Court has carefully considered the evidence before it and concludes that Leonhardt is likely to succeed on the merits of her claim. The parties have cited the Court to a number of reported and unreported decisions regarding the application of an "experimental" or "investigative" exclusion in a health insurance policy to the ABMT treatment. Although these decisions highlight important issues for the Court, none are controlling or extraordinarily persuasive on the facts of this case. As one judge recently stated,

The Court's ruling today—that the defendant must provide insurance coverage for plaintiff's cancer treatment—is based solely upon the court's interpretation of this particular plaintiff's health insurance policy. Future litigants seeking similar relief will find clearer guidance on how best to proceed in their own insurance policies rather than in this decision.

*Kekis*, 815 F.Supp. at 573.

■ Accordingly, the final determination of whether Leonhardt's proposed treatment is covered under the Plan will turn on an application of the Plan definition of "experimental" to the facts of this case. Because Holden "purports to rely upon a policy exclusion to justify its denial of coverage, it ... bears the burden of showing the applicability of that exclusion." *Id.* at 578.

A medical procedure is experimental under the Plan if it "is (a) not proven in an objec-

tive manner to have therapeutic value or benefit, (b) restricted to use at medical facilities capable of carrying out scientific studies; or (c) of questionable medical effectiveness." [9] The medical literature Leonhardt has provided to the Court describes studies in which ABMT treatment achieved partial or complete remissions in eighty percent of the patients treated.[10] Moreover, Leonhardt is a good candidate for successful ABMT treatment because of her age, health, and the fact that her cancer did show some response to traditional chemotherapy. *See Kulakowski*, 779 F.Supp. at 712–13.[11] This evidence suggests Holden will have a difficult time demonstrating that ABMT treatment performed by Dr. Barlogie would be "of questionable medical effectiveness" for her or "not proven in an objective manner to have therapeutic value or benefit."

Leonhardt has also provided the Court with a list of thirty-seven different medical institutions that perform bone marrow transplants for patients with multiple myeloma. (Supp. Ulrich Aff. Ex. 18.) At this early stage in the proceedings, it is unclear whether this list is exhaustive and whether all of these institutions would constitute "medical facilities capable of carrying out scientific studies." Leonhardt's expert, Dr. Schwerkoske, has submitted an affidavit stating that "[t]he treatment of multiple myeloma with high dose chemotherapy is not restricted to a certain type of medical facility. United Hospitals, for example, has high dose chemotherapy available for its multiple myeloma pa-

tients." (Schwerkoske Aff. ¶ 10.) Therefore, the Court finds that the use of the ABMT treatment for treating multiple myeloma may not be restricted to research facilities.

The evidence gathered by Holden after this lawsuit was filed does not alter the Court's conclusion that Leonhardt is likely to succeed on the merits of her claim. In support of its position, Holden has submitted an affidavit from Dr. Stanley Altman. Dr. Altman, who was hired by Holden through the Medical Review Institute, states that

> the ABMT procedure will be considered experimental until the medical community is presented with at least two randomized, controlled studies indicating a significant statistical and practical increase in the disease-free survival and overall survival rate for patients undergoing this therapy as opposed to patients undergoing standard therapy.

(Altman Aff. ¶ 5.) Although this may be Dr. Altman's understanding of the term "experimental," it is not the definition articulated in the Plan. The application of this substituted definition for the term "experimental" would, by itself, constitute an abuse of discretion. *See Kekis*, 815 F.Supp. at 581; *Dozsa*, 716 F.Supp. at 139. Moreover, the definition he chooses ignores the practical difficulties of obtaining randomized, controlled studies with terminally-ill cancer patients. (Koster Aff. ¶¶ 4, 5; Schwerkoske Aff. ¶ 12.)

Holden has also submitted a 1993 report from Hayes Incorporated, an information

---

9. Leonhardt argues that, to the extent that this definition is ambiguous, the language should be construed against Holden. This argument has previously been rejected by the Eighth Circuit. *See Bernards*, 987 F.2d 486, 488 n. 1 (8th Cir. 1993); *Finley v. Special Agents Mut. Benefit Assoc.*, 957 F.2d 617, 619 (8th Cir.1992).

10. The probative value of these studies in this case is increased by the fact that the proposed treating physician, Dr. Barlogie, is a co-author of two of the studies submitted by Leonhardt. *See* Sundar Jagannath, David Vesole, and Bart Barlogie, *High–Dose Therapy, Autologous Stem Cells, and Hematopietic Growth Factors for the Management of Multiple Myeloma, in* HIGH DOSE CANCER CHEMOTHERAPY 638 (J.O. Armitage et al., eds. 1992) (Schwerkoske Aff. Ex. B); B. Barlogie & G. Gahrton, *Bone Marrow Transplantation in Multiple Myeloma,* 7 Bone Marrow

Transplantation 71 (1991) (Schwerkoske Aff. Ex. C). To determine whether a given treatment is "experimental" for a specific patient, courts have focused on the credentials of the treating physician. *Compare Kulakowski*, 779 F.Supp. at 713 (treating physician had "personally performed several hundred bone marrow transplants") *with Lehman v. Mutual of Omaha Ins. Co.*, 806 F.Supp. 859, 862 (D.Ariz.1992) (referring physician "was not an expert on HDCT–ABMT and ... had very limited knowledge of HDCT–ABMT").

11. In contrast, several cases cited by Holden in support of its argument that the ABMT treatment is experimental involved patients whose cancer was already in remission. *See Lehman*, 806 F.Supp. at 862; *Schnitker v. Blue Cross/Blue Shield of Nebraska*, 787 F.Supp. 903, 905 (D.Neb. 1991).

clearinghouse for medical research. (Rogers Aff. Ex. E.) This report concludes that the use of the ABMT treatment for multiple myeloma is experimental. This report, however, is a compilation of medical research. It does not involve the application of the term "experimental," as defined by the Plan, to Leonhardt's proposed treatment. Moreover, as other courts have observed, "in cancer therapy . . . it takes time for literature to catch up with accepted practice and what doctors are actually doing." *Dozsa,* 716 F.Supp. at 139.

#### 4. *The Public Interest*

Finally, under the fourth factor, the Court finds that public interest also weighs in Leonhardt's favor. The procedural safeguards incorporated into ERISA and adopted by the Plan are intended to help claimants and plans process claims efficiently and fairly. In this case, BenePro denied Leonhardt those procedural safeguards and, as a result, denied her the opportunity to present information that strongly supports her claim. The statutory framework of ERISA demands that claimants be given a full and fair review.

#### 5. *Conclusion*

Having considered the four factors set forth in *Dataphase,* the Court concludes that Leonhardt is entitled to a preliminary injunction enjoining the Plan from continuing to deny coverage for her proposed treatment. The Court has also reviewed the verified financial information submitted by Leonhardt and concludes that a bond of $100,000 is necessary and appropriate.

### B. The Third–Party Plaintiff's Motion for a Preliminary Injunction

 Holden's motion for a preliminary injunction against the Reinsurers is guided by the same four *Dataphase* factors. 640 F.2d at 114. Having applied these four factors, the Court concludes that Holden is not entitled to a preliminary injunction against the Reinsurers.

Holden cannot show irreparable harm because any dispute between Holden and the Reinsurers is purely financial, and there is no reason to resolve the dispute in an expedited

manner. Holden's failure to show irreparable harm is, by itself, fatal to its motion. *See Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987). Furthermore, the Reinsurance Treaty does not require the Reinsurers to adjust any reinsurance claim until after the Plan pays for the treatment. Because the Plan has not yet submitted a claim under the Reinsurance Treaty, Holden's motion is premature. Finally, Holden has not established a likelihood of success on the merits. Accordingly, Holden's motion for a preliminary injunction will be denied.

### C. Leonhardt's Motion for Expedited Discovery

 Leonhardt asks this Court pursuant to Rules 33(a) and 34(b) of the Federal Rules of Civil Procedure for an order requiring BenePro to respond to its written discovery in an expedited fashion. The Court finds that expedited discovery is appropriate under the circumstances of this case. BenePro will respond to Leonhardt's written discovery, which was served with her Complaint, on or before June 17.

Accordingly, based upon a review of all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** That

1. The plaintiffs' motion for a preliminary injunction is GRANTED. Upon the filing of a bond in the sum of $100,000.00, with good and sufficient surety and approved by the Court, an injunction shall issue in the form attached.

2. Defendant/third-party plaintiff Holden Business Forms Company's motion for a preliminary injunction is DENIED.

3. The plaintiffs' motion for expedited discovery is GRANTED. BenePro, Inc. shall respond to the plaintiffs' written discovery requests that were served with the plaintiffs' Complaint on or before June 17, 1993.